**In re DOW CORNING CORPORATION, Debtors.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court, E.D. Michigan, Northern Division.

July 30, 1999.

Barbara J. Houser, Craig J. Litherland, David Ellerbe, Sheinfeld, Maley & Kay, P.C., Dallas TX, for debtor.

Ogden N. Lewis, Donald S. Bernstein, Michael S. Flynn, Davis Polk & Wardwell, Sheryl L. Toby, Michael J. Friedman, Honigman, Miller, Schwartz & Cohn, New York City, for the Official Committee of Unsecured Creditors.

David S. Rosner, Kasowitz, Benson, Torres & Friedman LLP, for Creditors Angelo, Gordon & Co., Appaloosa Management, L.P., Franklin Mutual Advisors, New York City, for Creditors.

Ralph R. Mabey, LeBoeuf, Lamb, Greene & MacRae, L.L.P. Management Co. LLC and Halcyon Offshore Management Co. LLC, Kenneth H. Eckstein, Jeffrey S. Trachtman, Kramer Levin Naftalis & Frankel LLP, Salt Lake City, UT, for the Official Committee of Tort Claimants.

Mark I. Bane, Kelley Drye & Warren LLP, New York City, for Chase Manhattan Bank.

Patrick A. Murphy, Murphy Sheneman, Julian & Rogers P.C., New York City, for Bank of America NT & SA.

Alan M. Gelb, Jones Hirsch Connors & Bull P.C., New York City, for Bear, Stearns Investment Products, Inc.

Robert S. Hertzberg, Hertz, Schram & Saretsky, P.C., Bloomfield Hills, MI, for

384

Davidson Kempner International Advisors, L.L.C. and M.H.M. Davidson Co., Inc.

Glenn E. Siegel, Winthrop, Stimson, Putnam & Roberts, New York City, for Bank of New York.

### AMENDED OPINION ON THE MEANING OF "INTEREST AT THE LEGAL RATE" IN 11 U.S.C. § 726(a)(5)

ARTHUR J. SPECTOR, Chief Judge.

The Official Committee of Unsecured Creditors ("U/S CC") and certain creditors holding general unsecured claims of a commercial nature objected to confirmation of the plan of reorganization filed jointly by the Debtor and the Official Committee of Tort Claimants (the "Proponents").[1] One of the objections turns on the interpretation of the term "interest at the legal rate" found in 11 U.S.C. § 726(a)(5). Because the Court agrees with the Proponents that the term refers to the federal judgment rate, 28 U.S.C. § 1961(a), this objection is overruled.

### I. Introduction

The U/S CC and a number of its constituents assert that the Joint Plan cannot be confirmed because it fails to satisfy § 1129(a)(7)'s "best-interest-of-creditors" test. This section reads as follows:

1. The objecting parties, who will be jointly referred to as the "Commercial Creditors," include the following: the U/S CC; Bank of America NT & SA; Bank of New York; Chase Manhattan Bank; Angelo, Gordon & Co., L.P., Franklin Mutual Advisers, and Appaloosa Management, L.P. (the "Angelo Group"); Halcyon/Alan B. Slifka Management Co. LLC and Halcyon Offshore Management Co. LLC ("Halcyon"); Bear, Stearns Investment Products, Inc.; and Davidson Kempner International Advisors, L.L.C. and M.H.M. Davidson & Co., Inc.

The U/S CC, Bank of America NT & SA, Bank of New York and Chase Manhattan Bank originally raised the objection at issue in connection with the Proponents' request to approve the Joint Plan's accompanying disclosure statement. Some courts recognize that grounds for disapproving a disclosure statement exist when the proposed plan is so "fatally flawed that confirmation is impossi-

A court may not confirm a chapter 11 plan unless:

(7) With respect to each impaired class of claims or interests—

> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date....

11 U.S.C. § 1129(a)(7). Under this statute the bankruptcy court must compare what a dissenting claimant would receive if the estate were liquidated under the provisions of chapter 7 of the Bankruptcy Code with what the claimant would receive under the plan. If the creditor would get more in a chapter 7 liquidation, then the plan cannot be confirmed. See 7 Collier on Bankruptcy ¶ 1129.03[7][b] (15th ed. rev.1999). The Commercial Creditors base their assertion that the plan fails this test on the chapter 7 distribution statute, which states:

(a) Except as provided in section 510 of this title, property of the estate shall be distributed—

ble." See, e.g., In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr.S.D.Ohio 1990); In re U.S. Brass Corp., 194 B.R. 420, 422 (Bankr. E.D.Tex.1996); Eastern Maine Electric Cooperative, 125 B.R. 329, 333 (Bankr.D.Me.1991); In re Monroe Well Service, Inc., 80 B.R. 324, 333 (Bankr.E.D.Pa.1987). At the disclosure hearing, the Court determined that the plan was not patently unconfirmable as a matter of law and declined to address those objections going to the legality of the Joint Plan.

Nonetheless, the current objection presents a discrete legal issue that was capable of being addressed in advance of the confirmation hearing scheduled to commence June 28, 1999. Therefore, the Court entered an order on March 9, establishing a briefing schedule and hearing date solely with respect to the issue of what rate of interest is required by § 726(a)(5). Oral arguments on the matter were heard April 15.

(1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title, proof of which is timely filed under section 501 of this title or tardily filed before the date on which the trustee commences distribution under this section;

(2) second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is—

(A) timely filed under section 501(a) of this title;

(B) timely filed under section 501(b) or 501(c) of this title; or

(C) tardily filed under section 501(a) or this title, if—

(i) the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and

(ii) proof of such claim is filed in time to permit payment of such claim;

(3) third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title other than a claim of the kind specified in paragraph (2)(C) of this subsection;

(4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, arising before the earlier of the order for relief or the appointment of a trustee, to the extent that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the holder of such claim;

(5) fifth, in payment of *interest at the legal rate* from the date of the filing of the petition, on any claim paid under paragraph (1), (2), (3), or (4) of this subsection; and

(6) sixth, to the debtor.

11 U.S.C. § 726(a) (emphasis added). The parties assume, as does the Court for purposes of this opinion, that there will be sufficient funds on hand to pay interest under the fifth paragraph. While the parties agree that § 1129(a)(7) requires the plan to provide interest on unsecured creditors' claims at the legal rate, they disagree over what such compliance entails.

The Proponents argue that § 726(a)(5) calls for interest at the rate determined under 28 U.S.C. § 1961(a). The Commercial Creditors vehemently disagree, arguing instead that the correct post-petition interest rate is the rate provided for in the contract or, if no contract rate exists, at the otherwise applicable statutory rate.

In resolving this conflict, there are two ways to proceed. One is to begin with 28 U.S.C. § 1961(a), and decide whether that statute governs allowed claims in bankruptcy. *See* Part II. The alternative is to focus on § 726(a)(5) and consider whether that statute incorporates 28 U.S.C. § 1961(a). *See* Part III. But regardless of the road traveled, the destination is the same— § 726(a)(5) requires post-petition interest to be calculated pursuant to 28 U.S.C. § 1961(a).

## II. Reference to "Money Judgment[s]" in 28 U.S.C. § 1961(a) Includes Allowed Claims in Bankruptcy

### A. 28 U.S.C. § 1961(a) Applies in Bankruptcy Cases

Section 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent ... of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." *Id.*

As indicated, the Commercial Creditors argue that the post-petition interest rate should be determined by some source other than this statute, such as state law or the terms of the parties' contract. Courts, however, must invoke § 1961(a) in those circumstances in which

the statute applies. *See Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988, 989 (6th Cir.1982) ("This provision mandates the imposition of post-judgment interest, thus removing the award of such interest from the discretion of the District Court."). Therefore, the Court may consider "alternatives" to § 1961(a) only if the claims of the Commercial Creditors are not governed by the statute. And, as will be explained, we believe that the statute is in fact controlling.

Section 1961 does not specifically mention the "Bankruptcy Court." But "bankruptcy judges ... constitute a unit of the district court" for the judicial district in which they serve. 28 U.S.C. § 151. Thus it would seem that the reference in § 1961(a) to the "district court" includes bankruptcy courts as well. *In re Goldblatt Bros., Inc.,* 61 B.R. 459, 466 n. 4 (Bankr. N.D.Ill.1986).

Noteworthy in this regard is subsection (c) of § 1961, which limits the statute's applicability with respect to certain judgments, and provides that certain other types of judgments are excluded from § 1961 altogether. Since judgments issued by bankruptcy courts are not mentioned in this subsection, the logical inference to draw is that they are subject to the full thrust of the statute. *Cf. Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 188, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("[T]here are no exemptions in the Endangered Species Act for federal agencies, meaning that under the maxim expressio unius est exclusio alterius, we must presume that [the exemptions listed in the statute] ... were the only 'hardship cases' Congress intended to exempt."). That inference is particularly appropriate here since there is no apparent reason why a judgment creditor's right to interest should turn on whether the judgment issued in the district court or a unit thereof. *Cf. United States v. Ron Pair Enters.,* 489 U.S. 235, 243, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (concluding that non-consensual lienholders are entitled to post-petition interest under 11 U.S.C. § 506(b), based in part on the Court's view that there was no "significant reason why Congress would have intended, or any policy reason would compel, that [such creditors] ... be treated differently" from those holding consensual security interests).

▪ And in fact, bankruptcy cases routinely hold that "[§ 1961(a) ] applies to bankruptcy proceedings." *In re Pester Refining Co.,* 964 F.2d 842, 849 (8th Cir. 1992); *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund,* 956 F.2d 152, 154 (7th Cir.1992); *In re Resyn Corp.,* 945 F.2d 1279, 1284 (3d Cir.1991); *Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874, 883 (11th Cir.1990); *In re Thrall,* 196 B.R. 959, 962 (Bankr.D.Colo. 1996) (collecting cases); *In re Meyer,* 206 B.R. 410, 419 (Bankr.E.D.Va.1997); *In re Harvard Knitwear, Inc.,* 193 B.R. 389, 399 (Bankr.E.D.N.Y.1996); *In re Southern Indus. Banking Corp.,* 87 B.R. 518, 520 (Bankr.E.D.Tenn.1988); *see also, e.g., In re Win–Vent, Inc.,* 217 B.R. 803, 818 (Bankr.W.D.Mo.), *aff'd,* 217 B.R. 798 (W.D.Mo.1997) (awarding interest under § 1961(a) on judgment for bank against the bankruptcy trustee and another party); *In re Ramirez Rodriguez,* 209 B.R. 424, 434 (Bankr.S.D.Tex.1997) (doing likewise in judgment for trustee); *In re Davis,* 172 B.R. 437, 459 (Bankr.D.D.C.1994) (doing likewise in judgment for debtor). Therefore, the Court concludes that the reference in § 1961(a) to judgments "recovered in a district court" includes judgments issued by a bankruptcy court.

## B. A § 502(b) Order Constitutes a Money Judgment

▪ The next issue is whether an allowed claim is a "money judgment." As one might expect, a "money judgment" consists of three elements: it must be a judgment; entitling the plaintiff to a specified sum of money; and such entitlement must be against an identifiable party. *In re Commonwealth Oil Ref. Co.,* 805 F.2d 1175, 1186 (5th Cir.1986). By definition,

an order issued pursuant to § 502(b) meets the second and third criteria. First, it confers upon the creditor a right of payment for a specified sum of money. *See* 11 U.S.C. § 502(b) (stating that after the court "determine[s] the amount of [a] claim," that such claim shall be allowed "in lawful currency of the United States"). Second, it identifies the party against whom such right of payment is enforceable—the estate. An allowed claim is, therefore, a claim for "money" within the meaning of § 1961(a).

■ The more difficult question is determining whether an allowed claim constitutes a judgment. "Judgment" is not defined by statute. But as explained by the Supreme Court, "[t]he judgment of a court is the judicial determination ... of the court upon a matter within its jurisdiction." *United States v. Hark*, 320 U.S. 531, 534, 64 S.Ct. 359, 88 L.Ed. 290 (1944). And unless otherwise qualified, it is a judicial decision that is final and subject to appeal. Bankruptcy Rule 7054, made applicable to all contested matters in bankruptcy through Bankruptcy Rule 9014, states that " '[j]udgment' as used in these rules includes a decree and any order from which an appeal lies." F.R.Bankr.P. 7054(a). *See also Schaefer Brewing Co.*, 356 U.S. at 234, 78 S.Ct. 674 (stating that a "final judgment ... [is] a 'complete act of adjudication' ... [which] was intended by the judge to be his final act in the case"); *Catlin v. United States*, 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."); *Catlin*, 324 U.S. at 233, 65 S.Ct. 631 (implicitly assuming that judgments are appealable as of right); *City of Louisa v. Levi*, 140 F.2d 512, 514 (6th Cir.1944) ("A final judgment is one which disposes of the whole subject, gives all the relief that was contemplated, provides with reasonable completeness, for giving effect to the judgment and leaves nothing to be done in the cause save superintend, ministerially,

the execution of the decree."); *Black's Law Dictionary* 841–42 (6th ed. 1990) (A judgment is "[t]he final decision of the court resolving the dispute and determining the rights and obligations of the parties. [It is t]he law's last word in a judicial controversy, it being the final determination by a court of the rights of the parties upon matters submitted to it in action or proceeding.").

The distinguishing feature of a judgment, then, is that it is a final judicial decision subject to appeal. *See also* 10 *Moore's Federal Practice*, § 54.02[2] (3d ed. 1999) ("If the order is appealable, the order is a 'judgment'...."); *cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("Restricting appellate review to 'final decisions' prevents the debilitating effect on judicial administration caused by piecemeal appellate disposition of what is, in practical consequence, but a single controversy.").

The concept of finality is expressly incorporated into bankruptcy jurisprudence through 28 U.S.C. § 158(a). That section provides that "district courts of the United States shall have jurisdiction to hear appeals ... from final judgments, orders, and decrees" entered by a bankruptcy court. 28 U.S.C. § 158(a)(1). Similarly, a court of appeals will have jurisdiction only over bankruptcy matters that are "final decisions, judgments, orders, and decrees entered" by the district court. 28 U.S.C. § 158(d). *See also In re Boddy*, 950 F.2d 334, 336 (6th Cir.1991) ("In order for this court to have jurisdiction, the underlying decision of the bankruptcy court must be final...."); *In re Morse Electric Co.*, 805 F.2d 262, 263 (7th Cir.1986) (recognizing "finality requirement" of § 158(d)); *In re The Hawaii Corp.*, 796 F.2d 1139, 1141 (9th Cir.1986) ("[T]he order of the district court must be 'final' before we have jurisdiction to review it [pursuant to § 158(d) ].").

The Sixth Circuit has recognized that whether a bankruptcy matter is final for

purposes of appeal can sometimes be difficult to resolve. *In re Millers Cove Energy Co.*, 128 F.3d 449, 451 (6th Cir.1997). However, "[v]irtually all decisions agree that the concept of finality applied to appeals in bankruptcy is broader and more flexible than the concept applied in ordinary civil litigation." *Id.* (citing 16 Wright & Miller, *Federal Practice and Procedure* § 3926.2 (2d ed.1996)); *see also In re Eagle–Picher Indus., Inc.*, 131 F.3d 1185, 1189 (6th Cir.1997) ("The unique nature of bankruptcy makes it possible to appeal a single, discreet [sic] issue while the bankruptcy proceedings continue in ways that may dramatically change the face of that issue."); *The Hawaii Corp.*, 796 F.2d at 1141–42 (citing cases). The reason that bankruptcy law contains this flexibility is fairly obvious: "[A] bankruptcy case is simply an aggregation of individual controversies, the resolution of which must be reached before bankruptcy distribution." 1 *Collier on Bankruptcy* ¶ 5.07[1][b] at 5–22 to 5–23 (citing *In re Martin Bros. Toolmakers, Inc.*, 796 F.2d 1435, 1437–38 (11th Cir.1986)). In describing the breadth of this flexibility, one of the drafters of the Bankruptcy Code stated:

> The unit of litigation by which finality will be measured is a "proceeding arising under title 11 of the United States Code or arising in or related to a case under title 11." A "case under title 11" is the umbrella under which all other matters take place. It is initiated by the filing of a petition under title 11 in the bankruptcy court, and terminated by an order dismissing or closing the case. Everything that occurs in the bankruptcy court between these two events is treated as "a proceeding arising in or related to" the bankruptcy case. This broad phrase encompasses everything that was formerly known as an adversary proceeding, contested matter, administrative matter, proceeding in bankruptcy or controversy arising in bankruptcy.

Richard B. Levin, *Bankruptcy Appeals*, 58 N.C.L.Rev. 967, 985 (1980); *see also Morse Electric*, 805 F.2d at 265 (The "disposition of a [matter] that would be final as a stand-alone suit outside of bankruptcy is also final [for purposes of appeal] in bankruptcy.").

It is not surprising, therefore, that courts almost uniformly recognize that a § 502(b) order entered by a bankruptcy court is final and subject to appeal. *In re Vause*, 886 F.2d 794, 797 (6th Cir.1989) (holding that an order which disallowed a claim pursuant to § 502(b)(6) was final and appealable); *Siegel v. Federal Home Loan Mortgage Corp.*, 143 F.3d 525, 529 (9th Cir.1998) (describing claims-allowance orders as "being in the nature of a final judgment" (citation omitted));[2] *Porges*, 44 F.3d at 165; *Walsh Trucking Co. v. Insurance Co. of North America*, 838 F.2d 698, 701 (3d Cir.1988) ("[A]n order expunging a creditor's claim in an ongoing bankruptcy proceeding is a final order immediately appealable...."); *In re Fox*, 762 F.2d 54, 55 (7th Cir.1985) ("A proceeding to establish a claim against a bankrupt estate is final for purposes of appeal when it is over and done with, even though the bankruptcy goes on."); *In re Saco Local Dev. Corp.*, 711 F.2d 441, 448 (1st Cir.1983) (Breyer,

**2.** *Siegel* would, at first blush, seem to be in conflict with a more recent Ninth Circuit decision, *In re Southern California Plastics, Inc.*, 165 F.3d 1243 (9th Cir.1999). The creditor in *California Plastics* had "obtained a prejudgment attachment lien against the debtor's property pursuant to California" statutory law. *Id.* at 1244. Such a lien confers "no right to proceed against the property until after the creditor obtains a judgment." *Id.* at 1246. Before the creditor could do so, however, the debtor filed for bankruptcy relief.

*Id.* at 1245. The creditor's claim was allowed, and the question before the court was whether that allowance was "an acceptable alternative" to a California State court judgment so as to perfect the attachment lien. *Id.* at 1246. The court held that the California statute was not satisfied. *California Plastics* is inapposite because it interpreted a California statute, not a federal one. Presumably, therefore, the court saw no need to even mention, let alone expressly overrule, its *Siegel* decision, issued only eight months previously.

J.) ("[A]s long as an order allowing a [bankruptcy] claim ... effectively settles the amount due the creditor, the order is 'final'....."); *In Matter of Baudoin*, 981 F.2d 736, 742 (5th Cir.1993) (though expressing some reservation over the matter, the court, nonetheless, concluded that "[a]n order allowing a proof of claim is ... a final judgment"); *In re Moody*, 849 F.2d 902, 904 (5th Cir.1988) ("[C]onsidering that the allowance of the claim ended a discrete judicial unit in the bankruptcy case, ... the judgment [allowing the claim] ... is a final judgment under 28 U.S.C. § 1291."); *see also* 1 *Collier on Bankruptcy* ¶ 5.07[2]; 6 *Norton Bankruptcy Law and Practice 2d* § 148:26 (1997).

 It would seem to be well-settled that a § 502(b) order is a final judgment subject to appeal. This is particularly true in the Sixth Circuit where appeals on § 502(b) orders are routinely heard. *See In re Highland Superstores, Inc.*, 154 F.3d 573, 576 (6th Cir.1998) (appeal of district court order which had reversed the bankruptcy court and disallowed the creditor's claim); *Eagle–Picher*, 131 F.3d at 1187 (appeal of district court order which had affirmed the bankruptcy court's order disallowing the creditor's claim); *In re Century Offshore Mgmt. Corp.*, 111 F.3d 443, 447 (6th Cir.1997) (same); *In re Brentwood Outpatient, Ltd.*, 43 F.3d 256, 259 (6th Cir.1994) (cross-appeals of district court's order affirming the bankruptcy court's partial allowance of the creditor's claim).[3]

While certainly not controlling, a 123–year old decision by the Supreme Court arising under the National Banking Act, adds substantial support for the conclusion that an allowed claim in bankruptcy is the equivalent of a money judgment for purposes of the federal judgment interest statute. *National Bank of the Common-*

---

**3.** One Sixth Circuit decision can be viewed as standing for the proposition that a § 502(b) order is not final. *In re Inland Gas Corp.*, 187 F.2d 813 (6th Cir.1951). In *Inland Gas*, a case decided under the Bankruptcy Act, the court stated that "the allowance of a bankruptcy claim remains interlocutory until the estate has been closed." *Id.* at 816. *Inland Gas*, however, suffers from a number of insurmountable deficiencies that negate it. First, it appears to be inconsistent with other pre-Code decisions rendered by the Sixth Circuit. *See Stearns Salt & Lumber Co. v. Hammond*, 217 F. 559, 564 (6th Cir.1914) ("It is well settled that the action of a referee in bankruptcy allowing or disallowing a claim is a judgment, final in the absence of review...."); *see also Louisville & N.R.R. v. United States (In re Tennessee Central Ry.)*, 498 F.2d 904, 906 (6th Cir.1974) (summarily dismissing *Inland Gas* as "completely inapposite").

In addition, the case relied upon by *Inland Gas* was plainly wrong as a matter of law. In *New York N.H. & H.R. Co. v. Reconstruction Fin. Corp.*, 180 F.2d 241, 243 (2d Cir.1950), the court stated that "[b]y virtue of Sec. 57, sub. k of the Bankruptcy Act, ... the allowance of claims remains interlocutory until the estate has been closed." That section of the Bankruptcy Act did not use the word "interlocutory". Rather, it provided that "[c]laims which have been allowed may be reconsidered for cause ... before ... the estate has

been closed." Bankruptcy Act, § 57, subs. k, 11 U.S.C. § 93, subs. k (repealed 1978). The Bankruptcy Code also provides that "[a] claim that has been allowed or disallowed may be reconsidered for cause." 11 U.S.C. § 502(j). The same could be said of any judgment or order issued by a federal court. *See* F.R.Civ.P. 59 and 60(b); *cf.* F.R.Bankr.P. 9023 and 9024. And if a party seeks relief from a "final" order pursuant to one of these cited provisions, that order may become "nonfinal for purposes of appeal for as long as the [motions for relief are] pending." *United States v. Dieter*, 429 U.S. 6, 8, 97 S.Ct. 18, 50 L.Ed.2d 8 (1976); *see also Stone v. INS*, 514 U.S. 386, 402–03, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995). But the mere availability of these "post-order" remedies does not otherwise alter the finality of a judicial decision. *See J. Catton Farms, Inc. v. First Nat'l Bank of Chicago*, 779 F.2d 1242, 1250 (7th Cir.1985) ("[T]he fact that an order ... may later be modified[ ] does not make it nonfinal."); *see also Walsh Trucking*, 838 F.2d at 700 ("[T]he filing of a motion for reconsideration in the bankruptcy court ... is not a jurisdictional pre-condition to an appeal to the district court."). Thus, *Inland Gas* was incorrect when it stated that an order allowing a claim was nonfinal because it could be reconsidered on motion by an aggrieved party. Not surprisingly, the Sixth Circuit has since rejected *Inland Gas* and it is not good law in this circuit.

*wealth v. Mechanics' Nat'l Bank,* 94 U.S. 437, 24 L.Ed. 176 (1876). The immediate predecessor to § 1961 was 28 U.S.C. § 811, which in turn was originally codified as R.S. § 966. *See* Historical and Statutory Notes following 28 U.S.C.A. § 1961; 62 Stat., Part I, at 993 (1948). Section 966 provided:

> Interest shall be allowed on all judgments in civil causes recovered in a circuit[4] or district court, and may be levied by the marshal under process of execution issued thereon, in all cases where, by the law of the State in which such court is held, interest may be levied under process of execution on judgments recovered in the courts of such State; and it shall be calculated from the date of the judgment, at such rate as is allowed by law on judgments recovered in the courts of such State.

R.S. 966 (*reprinted in* Revised Statutes of the United States, at p. 182 (2d ed. 1878)).[5]

In *Commonwealth,* a receiver was appointed by the comptroller of the currency for a failing bank. A provision of the National Banking Act "require[d] the comptroller ... to apply the moneys paid over to him by the receiver 'on all such claims as may have been proved to his satisfaction, or adjudicated in a court of competent jurisdiction.'" *Id.* at 439, 24 L.Ed. 176 (quoting the Act). The plaintiff argued that it was entitled to interest on the claims against the bank. The Court agreed, reasoning that once the plaintiff's claim had been proved, it was the equivalent of a judgment.

If these claims had been put in judgment, whether in a court of the United States or in a State court of that State, the result as to interest upon the judgment would have been the same. It was unnecessary to reduce them to judgment, because they were proved to the satisfaction of the comptroller. *After they were so proved, they were of the same efficacy as judgments, and occupied the same legal ground.*

[T]he claims, when proved to the satisfaction of the comptroller, were upon the same footing as if they had been in judgment.

*Id.* at 439–40, 24 L.Ed. 176 (emphasis added).

Although *Commonwealth* was not a bankruptcy case, the parallels between that decision and this case are unmistakable. The Court was, after all, confronted with the question of whether a closely analogous precursor to § 1961 encompassed claims made against an insolvent estate. The holding that the claims were at least within the spirit of R.S. § 966 is therefore directly pertinent here. And given that *Commonwealth* had little trouble in concluding that a proved claim in a receivership was on the "same footing as ... [a] judgment," we are confident that the Court, if confronted with the question, would decide that a § 502(b) order is in fact a judgment. After all, it is a final order entered by a federal judge, after a hearing conducted in a court of the United States in accordance with the Federal Rules of Civil Procedure (incorporated into

---

**4.** There once existed "circuit courts [which] had both original and appellate jurisdiction." Charles A. Wright, *Handbook of the Law of Federal Courts* 4 (3d ed.1976). These courts were abolished in 1911. *Id.* at 6.

**5.** As can be seen, the interest rate under this statute was tied to the prevailing law of the forum state. By virtue of a 1982 amendment, § 1961(a) differs from § 966 in that respect. *See generally,* S.Rep. No. 97–275, 97th Cong., 2d Sess. 1, 11 (*reprinted in* Vol. 2, 1982 U.S.C.C.A.N. 11, 21) ("Under current law, the interest rate on judgments in the Federal

courts is based on varying State laws and frequently falls below the contemporary cost of money. Part B of title III [i.e., § 302 of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164] sets a realistic and nationally uniform rate of interest on judgments in the Federal courts."). However, this change in the methodology for computing interest clearly has no bearing on the question of whether a § 502(b) order falls within the scope of § 1961(a). And as to that issue, R.S. § 966 is essentially the same as current § 1961(a).

bankruptcy jurisprudence by F.R.Bankr.P. 9014). *See also In re Szekely,* 936 F.2d 897, 899 (7th Cir.1991) ("[T]he decision to allow the claim is deemed a final order.... It is so treated because it is the practical equivalent of a final judgment in a stand-alone suit."); *In re John Osborn's Sons & Co.,* 177 F. 184, 186 (2d Cir.1910) (quoting extensively from *Commonwealth,* and reasoning that "allowed claims in bankruptcy are as much entitled to be treated as judgments");[6] *In re Chiapetta,* 159 B.R. 152, 161 (Bankr.E.D.Pa.1993) ("[S]ince a claim is like a judgment entered at the time of the bankruptcy filing, the applicable [interest] rate should be the federal judgment rate...."); *Wasserman v. City of Cambridge,* 151 B.R. 4, 6 n. 2 (D.Mass.1993) ("Upon the filing of bankruptcy, claims of creditors are treated as the functional equivalent of a federal judgment against the estate's assets."); *In re Laymon,* 117 B.R. 856, 864 (Bankr.W.D.Tex.1990), *aff'd,* No. A–90–CA–1025, 1991 WL 349624 (W.D.Tex. Mar. 22, 1991), *rev'd on other grounds,* 958 F.2d 72 (5th Cir.1992) ("[A]n allowed claim ... is the functional equivalent of a *federal judgment* against the estate's assets...."); *see also Siegel,* 143 F.3d at 529 (A claim-allowance order is "in the nature of a final judgment."); *In re Godsey,* 134 B.R. 865, 867 (Bankr. M.D.Tenn.1991).[7]

The Court, therefore, concludes that a § 502(b) order constitutes a judgment. Moreover, we conclude that such an order is a "money judgment" as that term is used in the context of 28 U.S.C. § 1961(a).

## C. Claims Which Are Deemed Allowed Are Also Deemed Money Judgments

■ Most claims, of course, are uncontested, so an order either disallowing or

---

6. The Second Circuit subsequently limited the holding in *John Osborn's Sons & Co.,* to liquidation cases. *See In re Realty Assocs. Sec. Corp.,* 163 F.2d 387, 390 (2nd Cir.1947). The court reasoned that in a reorganization proceeding, a creditor's rights are ultimately defined by the plan rather than the order allowing its claim. *Id.* Since we are obliged by § 1129(a)(7)(A)(ii) to analyze the present issue as though the Debtor were in chapter 7, this distinction is irrelevant here.

7. Some courts have suggested that *Commonwealth* was overruled by *Kaiser Aluminum & Chemical Corp. v. Bonjorno,* 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990), due to the latter case's strict interpretation of § 1961(a). *See Transmatic, Inc. v. Gulton Indus., Inc.,* 180 F.3d 1343, 1349 (Fed.Cir. 1999); *Andrulonis v. United States,* 26 F.3d 1224, 1230 (2d Cir.1994) (citing *Bonjorno* for its contention that, "when the animating principle [of post-judgment interest] suggests one result and the statute another, the statute controls"). This Court, however, is not willing to pronounce the demise of *Commonwealth.*

*Bonjorno* does not even mention *Commonwealth,* much less purport to overrule it. *See generally College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 131 F.3d 353, 365 (3d Cir.1997), *cert. granted,* —— U.S. ——, 119 S.Ct. 790, 142 L.Ed.2d 653 (1999) ("[A] court ... should be reluctant to hold that the Supreme Court implicitly has overruled its own decision when the Court had an opportunity to overrule the decision explicitly and did not do so.....[W]e view our methodology as in keeping with the respect which we must pay to the Supreme Court."); *Levine v. Heffernan,* 864 F.2d 457, 461 (7th Cir.1988) ("Lower courts ..., out of respect for the great doctrine of *stare decisis,* are ordinarily reluctant to conclude that a higher court precedent has been overruled by implication.....A lower court decision that employs analogy to conclude that a higher court precedent has been implicitly overruled ... significantly undermines the doctrine of *stare decisis.*"); *see also White v. Johnson & Johnson Prods., Inc.,* 712 F.Supp. 33, 38 (D.N.J.1989) ("Of course, to the extent that [a Supreme Court decision] ... contradicts ... [an earlier Supreme Court decision, the later decision] controls.....However, it is preferable to attempt to harmonize the two Supreme Court cases...."). The holdings of *Bonjorno* and *Commonwealth* are mutually compatible. *Commonwealth* stands for the proposition that any binding decision which finally determines the rights of parties to a dispute should be afforded the dignity of a judgment. *Bonjorno,* on the other hand, does not purport to ascertain what constitutes a judgment. Rather, it deals with the next step in the process. That is, once it is determined that a decision or order is entitled to be treated as a judgment, *Bonjorno* identifies the date from which post-judgment interest begins to run. As can be seen, then, the two cases deal with different issues and there is no reason to presume that *Bonjorno* overruled *Commonwealth.*

allowing such claims is never entered. For purposes of this opinion, it is not necessary to decide whether claims which are deemed allowed have the same preclusive effect as a § 502(b) order. *Compare Siegel*, 143 F.3d at 530 (holding that a claim which is deemed allowed has the same *res judicata* effect as a claim allowed pursuant to a court order) *with County Fuel Co. v. Equitable Bank Corp.*, 832 F.2d 290, 292 (4th Cir.1987) ("[I]t is doubtful that 'automatic allowance' under 11 U.S.C. § 502(a) of a claim not objected to constitutes a 'final judgment' of the type that gives rise to 'bar' or 'claim preclusion' under strict res judicata principles."). Rather, the Court's present focus is on how, for purposes of distribution within the bankruptcy case, the treatment of a deemed-allowed claim compares with that of a claim allowed pursuant to a § 502(b) order.

The Code makes no substantive distinction among allowed-claim holders based on how allowance came about. *See* 11 U.S.C. § 502(a) ("A claim [to which no party in interest objects] ... *is deemed allowed*." (emphasis added)); *Black's Law Dictionary* (6th ed.1990) (defining the word "deem" as meaning to "treat as if"). *See also, e.g.*, 4 *Collier on Bankruptcy* ¶ 502.02[3][a] ("Until an objection is made and sustained, all allowed claims stand on equal footing for purposes of distribution of the debtor's assets."); 11 U.S.C. § 726(a)(2) (providing that second in order of distribution is "any allowed unsecured claim"); *In re Darnell*, 834 F.2d 1263, 1265 (6th Cir.1987) ("Section 726 provides for pro rata distribution among two or more claims of the same priority class.").[8] Consequently, a creditor that encounters no resistance to its claim is treated for distribution purposes the same as if a § 502(b) order had in fact been entered in its favor. In the previous Section, the Court determined that a claim allowed pursuant to a § 502(b) order constitutes a "money judgment." It follows that for purposes of distribution a claim that is "deemed allowed" will be treated as if it were also a "money judgment."

## D. Effect of Bankruptcy Code § 726(a)(5)

Thus far the Court has determined that 28 U.S.C. § 1961(a) applies to bankruptcy proceedings and that a claim allowed pursuant to a § 502(b) order is a "money judgment." We also concluded that for purposes of distribution under the Code, a claim which is deemed allowed will also be deemed to be a money judgment. It would therefore seem that bankruptcy courts are required to apply 28 U.S.C. § 1961(a) to allowed unsecured claims. But doing so is potentially problematic in light of the Supreme Court's decision in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990).

In *Bonjorno*, the issue was "whether interest under [§ 1961(a) ] should be calculated from the date of verdict or the date of judgment." *Id.* at 834, 110 S.Ct. 1570. Recall that 28 U.S.C. § 1961(a) specifically provides that "interest shall be calculated from the date of the entry of the judgment." The Court cited the rule that, absent legislative intent to the contrary, a statute must be construed in accordance with its plain language. *Id.* at 835, 110 S.Ct. 1570 (citation omitted). It then ob-

---

8. Neither the Code nor the Bankruptcy Rules establish a deadline within which objections to claims must be made. 9 *Collier on Bankruptcy* ¶ 3007.01[5] (15th ed. rev.1999). It is therefore possible that "a dividend may be paid on a [deemed allowed] claim which may thereafter be disallowed on objection made pursuant to [Bankruptcy Rule 3007]." Advisory Committee Note (1983) to F.R.Bankr.P. 3007. Moreover, "[t]he amount of the dividend paid [on such claim] before ... disallowance ... would be recoverable by the trustee in an adversary proceeding." *Id.* However, this procedural aspect of the claims-allowance process does not change the fact that the Code's rules of distribution apply equally to all unsecured claims, regardless of whether those claims are deemed allowed, or allowed pursuant to a § 502(b) order.

served that the language of 28 U.S.C. § 1961(a) does not "allude[ ] to the date of the verdict, and there is no legislative history that would indicate congressional intent that interest run from the date of the verdict rather than the date of the judgment." *Id.* From this the Court "conclude[d] that postjudgment interest properly runs from the date of the entry of judgment." *Id.*

If *Bonjorno* stands for the proposition that 28 U.S.C. § 1961(a) must, under all circumstances, be interpreted in accordance with its plain language, then this section would seem to conflict with bankruptcy law. As indicated, 28 U.S.C. § 1961(a) states that "interest shall be allowed[, notwithstanding the solvency of the defendant,] on any money judgment," and that such "interest shall be calculated from the date of the entry of the judgment." On the other hand, § 502(b)(2) generally prohibits the payment of post-petition interest on unsecured claims in bankruptcy. 11 U.S.C. § 502(b)(2); *see also* 4 *Collier on Bankruptcy* ¶ 502.03[3][a]. It is only when estate proceeds are sufficient that post-petition interest becomes payable pursuant to § 726(a)(5). *See* 11 U.S.C. § 726(a)(5).

*Bonjorno* 's plain-language interpretation of 28 U.S.C. § 1961(a) does not render the federal judgment statute inapplicable to the payment of post-petition interest in bankruptcy. Sections 502(b)(2) and 726(a)(5) were not at issue in *Bonjorno,* so the Court did not have occasion to consider how they interrelate with 28 U.S.C. § 1961(a). Consequently, *Bonjorno* is not dispositive in that regard. Moreover, it is a "familiar rule of statutory construction that, when possible, courts should construe statutes . . . to foster harmony with other statutory . . . law." *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 879, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994) (citations omitted). Harmonizing these statutes is a simple task.

A central policy of the Bankruptcy Code is the equitable distribution of a debtor's assets among its creditors. *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); *In re McCafferty,* 96 F.3d 192, 196 (6th Cir.1996). Similarly, the Code is designed to achieve an "equality of treatment among similarly situated creditors." *In re Lockard,* 884 F.2d 1171, 1178 (9th Cir.1989); *In re Jet Florida System, Inc.,* 841 F.2d 1082, 1083 (11th Cir.1988). Another objective of the Code is to accomplish a prompt and efficient administration of the bankruptcy estate. *Katchen v. Landy,* 382 U.S. 323, 328–29, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966); *Chemetron Corp. v. Jones,* 72 F.3d 341, 346 (3rd Cir.1995); 11 U.S.C. § 704. Sections 502(b)(2) and 726(a)(5) modify 28 U.S.C. § 1961(a)'s application to the Bankruptcy Code so that compliance with these crucial bankruptcy policies is attainable.

The equitable distribution of a debtor's assets requires that the principal of all claims of the types specified in subsections (1) through (4) of § 726(a) be paid in full before interest can be paid. Accordingly, § 502(b)(2) creates an exception to the general rule of 28 U.S.C. § 1961(a) that interest "shall be allowed on any money judgment." The Code then creates an exception to the exception in § 726(a)(5).

In addition, § 726(a)(5) provides that interest begins to run from the bankruptcy petition date, as opposed to the terminology in 28 U.S.C. § 1961(a)—the date the judgment is entered. But the two statutes are not necessarily inconsistent on this point. Several courts have stated that a creditor's claim is deemed to be a "judgment" entered on the date of the petition. *Chiapetta,* 159 B.R. at 161; *Wasserman,* 151 B.R. at 6 n. 2; *Laymon,* 117 B.R. at 864. If these courts are correct, then both 28 U.S.C. § 1961(a) and § 726(a)(5) start the interest clock running from the same date. This viewpoint is sensible given that unsecured claims are valued as of the petition date. But even if one believes that a claim becomes a judgment at some other

point, § 726(a)(5) is appropriately viewed as a necessary modification to 28 U.S.C. § 1961(a) with respect to the date interest begins to run. If equitable distribution and equality of treatment is to be achieved, interest must begin to run on the same date for all creditors. Moreover, this aspect of § 726(a)(5) greatly enhances a trustee's ability to administer the bankruptcy estate in a prompt and efficient manner. As a result, §§ 502(b)(2) and 726(a)(5) are properly deemed statutory modifications to 28 U.S.C. § 1961(a).

For these reasons, the Court concludes that in this presumptively-solvent estate, the Proponents are required by 11 U.S.C. §§ 1129(a)(7), 502(b)(2), 726(a)(5) and 28 U.S.C. § 1961(a) to provide interest on the Commercial Creditors' claims at the rate stated in the latter statute. Moreover, we believe that 28 U.S.C. § 1961(a) is implicitly incorporated by 11 U.S.C. § 726(a)(5). The grounds for this alternative holding are explained in the next part of the opinion.

### III. "Interest at the Legal Rate" Means the Federal Judgment Rate

This Part of the opinion begins its analytical journey from a different port— § 726(a)(5). Sections A and B discuss case law addressing § 726(a)(5). In Section C, we determine that the commonly understood meaning of "interest at the legal rate" is a rate fixed by statute. Section D holds that the statute to which Congress refers when establishing "the legal rate" as the benchmark is 28 U.S.C. § 1961(a).

### A. "State Law Approach" is Unpersuasive

Case law is sharply divided over the meaning of "interest at the legal rate," with one line of cases following the "state law approach," [9] and the other following the "federal judgment rate approach." [10] Neither line of cases is very persuasive, but the cases adopting the state law approach are exceptionally insubstantial.

Although it is impossible to glean one uniform methodology from the state law approach cases, they generally award post-petition interest at the contract rate, or, if a contract rate does not exist, at the otherwise applicable state statutory rate. The first reported Code case to adopt this approach was *In re Shaffer Furniture Co.*, 68 B.R. 827 (Bankr.E.D.Pa.1987), *abrogated by In re Chiapetta*, 159 B.R. 152 (Bankr. E.D.Pa.1993).

In *Shaffer*, the unsecured creditors of a solvent, liquidating chapter 11 debtor moved for the payment of post-petition interest on their claims. *Id.* at 828. The court began by stating that the payment of post-petition interest by a solvent debtor was not required, but was instead dependent upon the equities of the case. *Id.* at 830. After deciding that the equities of the case justified the payment of post-petition interest, the court turned to the issue of what that rate should be. Admitting that the issue had not been briefed by

9. *See In re Adcom, Inc.*, 89 B.R. 2 (D.Mass. 1988); *Federal Savings & Loan Corp. v. Moneymaker (In re A & L Properties )*, 96 B.R. 287 (C.D.Cal.1988); *In re Carter*, 220 B.R. 411 (Bankr.D.N.M.1998); *In re Huang*, 192 B.R. 184 (Bankr.N.D.Ill.1996); *In re Boehm*, 202 B.R. 99, 100 (Bankr.N.D.Ill.1996); *In re Schoeneberg*, 156 B.R. 963 (Bankr.W.D.Tex. 1993); *Kellogg v. United States (In re West Texas Marketing Corp.)*, 155 B.R. 399, 402–03 (Bankr.N.D.Tex.1993); *In re Beck*, 128 B.R. 571 (Bankr.E.D.Okla.1991); *In re Rivera*, 116 B.R. 17 (Bankr.D.P.R.1990); *In re Boyer*, 90 B.R. 200 (Bankr.D.S.C.1988).

10. *See In re Beguelin*, 220 B.R. 94 (9th Cir. BAP 1998); *In re Gaines*, 178 B.R. 101 (Bankr.W.D.Va.1995); *In re David Green Property Mgmt.*, 164 B.R. 92 (Bankr.W.D.Mo. 1994); *In re Chiapetta*, 159 B.R. 152 (Bankr. E.D.Pa.1993); *In re Melenyzer*, 143 B.R. 829 (Bankr.W.D.Tex.1992); *In re Godsey*, 134 B.R. 865 (Bankr.M.D.Tenn.1991); *In re Laymon*, 117 B.R. 856, 864 (Bankr.W.D.Tex. 1990), *aff'd*, No. A–90–CA–1025, 1991 WL 349624 (W.D.Tex. Mar. 22, 1991), *rev'd on other grounds*, 958 F.2d 72 (5th Cir.1992). *See also Crawford Corp. v. Crawford*, 836 F.2d 549, 1987 WL 30588 (6th Cir. Dec. 31, 1987) (unpublished); *Wasserman v. City of Cambridge*, 151 B.R. 4 (D.Mass.1993).

the parties, the court's analysis was cursory—"We believe that, in this area, we are 'governed by state law, absent an overruling federal law.'" *Id.* at 831 (quoting *Debentureholders Protective Comm. v. Continental Inv. Corp.,* 679 F.2d 264, 268 (1st Cir.1982)). It then concluded that post-petition interest should be awarded at one of Pennsylvania's state statutory rates. *Id.*

▪ *Shaffer*'s premise that the decision to award post-petition interest is discretionary was incorrect. This was the rule under pre-Code law. *See, e.g. Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 163, 67 S.Ct. 237, 91 L.Ed. 162 (1946). But it is clear from § 726(a)(5) that payment of interest is no longer a matter of discretion; it is mandatory when estate proceeds are sufficient. Yet *Shaffer* failed to analyze § 726(a)(5). Not surprisingly, the judge who decided *Shaffer* later changed his position. In *Chiapetta,* Judge Scholl held that § 726(a)(5) requires post-petition interest to be paid at the federal judgment rate. Acknowledging his change of position, Judge Scholl stated that "the federal judgment rate [was] an alternative which was not proposed by any of the parties [in *Shaffer*] and, frankly did not occur to [the court] in deciding [that case]." *Chiapetta,* 159 B.R. at 160.

Soon after *Shaffer,* the state law approach was adopted by *In re Adcom, Inc.,* 89 B.R. 2 (D.Mass.1988). That court relied solely on a bare cite to *Shaffer* as the support for its holding that the state commissioner of revenue was entitled to receive post-petition interest at the state statutory rate imposed on delinquent tax payments. *Id.*

The next state law approach case was *Federal Savings & Loan Corp. v. Moneymaker (In re A & L Properties),* 96 B.R. 287 (C.D.Cal.1988). With its first step, the court incorrectly noted that there was no case law on the issue of what post-petition interest rate was required by § 726(a)(5). It then observed incorrectly that there was

no probative legislative history on point. Based upon these miscues, the court founded its eventual holding on the strength of averments made by two bankruptcy commentators. The first was the 1987 edition of *Collier on Bankruptcy.* That edition flatly stated that "'section 726(a)(5) of the Code does not change prior law.'" *Id.* at 289 (quoting 4 *Collier on Bankruptcy* ¶ 726.02[5] (15th ed.1987)). The court then concluded that under the Bankruptcy Act, post-petition interest was generally payable at the contract rate if one was available, and if not, at the otherwise applicable state statutory rate. *Id.* (citing 3A *Collier on Bankruptcy* ¶ 63.16, 1860–61 (14th ed.1975)). For further support, the court cited a law review article arguing that under § 726(a)(5) unsecured "'creditors who had bargained for a rate of interest ... [should receive] the bargained-for rate....'"*Id.* (quoting Fortgang & King, *The 1978 Bankruptcy Code: Some Wrong Policy Decisions,* 56 N.Y.U.L.Rev. 1148, 1153 (1981) ("*Some Wrong Policy Decisions*")).

*A & L Properties'* reliance on the above-cited authorities was misplaced. *Some Wrong Policy Decisions* was a position paper in which its authors argued that Congress made some wrong choices in the Code. One of those supposedly wrong choices pertained to the version of § 726(a)(5) Congress ultimately enacted. In the article, the co-authors asserted, without citation to any supporting authority, that "interest at the legal rate" could possibly be defined in the first instance as the contract rate. *Some Wrong Policy Decisions* at 1151. But a thorough reading of the article definitively shows that the authors did not believe this to be the case. The entire discussion of § 726(a)(5) focused on the authors' strong disagreement with the fact that, as enacted, § 726(a)(5) would not provide unsecured creditors post-petition interest at the bargained-for contract rate. The article goes so far as to propose an amendment to the Code—the elimination of the term "at the

legal rate" from § 726(a)(5)—in order to remedy the situation. *Id.* at 1161–64. Such an amendment, the authors asserted, would reinstate the pre-Code practice of paying post-petition interest at the contract rate, and otherwise the applicable state statutory rate. *Id.* at 1164. Thus, *Some Wrong Policy Decisions* actually stands for the proposition that the Code prohibits the payment of post-petition interest to unsecured creditors at the contract rate.

Two points about one of the article's co-authors, Professor King, are also of relevance. Professor King was an unpaid consultant to the original Commission on the Bankruptcy Laws of the United States. *Report of the Commission on the Bankruptcy Laws of the United States,* H.R. Doc. No. 93–137, 93d Cong., 1st Sess. (1973), Preface, *reprinted in* Collier App. Pt. 4(c), at 4–226. The Commission's recommendations were largely adopted by Congress when it enacted the Bankruptcy Code in 1978. Obviously, then, he was better situated than most people to know whether Congress had adopted the position he preferred with respect to post-petition interest on unsecured claims. Based on *Some Wrong Policy Decisions,* it is clear that Professor King believed Congress had not done so. Additionally, Professor King is the editor-in-chief of *Collier on Bankruptcy,* the other authority relied on by *A & L Properties.* It is telling that the current edition of the treatise states: § 726(a)(5) "suggests that Congress envisioned a single rate, probably the federal statutory rate for interest on judgments set by section 1961 of title 28 of the United States Code." 6 *Collier on Bankruptcy* ¶ 726.02[5].

Despite its obvious shortcomings, *A & L Properties* was the exclusive authority relied on by *Kellogg v. United States (In re West Texas Marketing Corp.),* 155 B.R. 399, 402–03 (Bankr.N.D.Tex.1993), which held that unsecured creditors were entitled to post-petition interest at "the contract rate where applicable and, alternatively, the rate of interest under state law."

*In re Rivera,* 116 B.R. 17 (Bankr.D.P.R. 1990), is another case adopting the "state law approach." The court relied on cases which addressed the interest rate that *secured* creditors are entitled to, citing *Cardinal Fed. Savings & Loan v. Colegrove (In re Colegrove ),* 771 F.2d 119 (6th Cir. 1985) *and In re Frost,* 47 B.R. 961 (D.Kan. 1985). It supported looking "to the most secure loan, . . . government bonds of some length of time and adding 2 or 3 points for the undesirability [of the loan] . . . and an additional ½ to 1 point for the added chapter 11 risk factor," [11] but inexplicably awarded post-petition interest at "the Puerto Rico legal rate." [12] *Id.* at 19. The cases relied upon by *Rivera* make it difficult to tell the purpose for which the court was deciding the appropriate interest rate. Most of the cases cited dealt with determining the discount rate for a chapter 13 plan's payment of a secured claim. Choosing the appropriate present value discount rate for purposes of a chapter 13 plan would seem to be an entirely different issue than the post-petition interest rate required by § 726(a)(5). Despite its lack of clarity, we nonetheless include *Rivera* in

---

11. This statement could surely serve as the poster-child for the kind of haphazard subjective method for determining post-petition interest that we believe Congress hoped to eliminate when it enacted § 726(a)(5) with language specifying an interest rate. *Cf. Bank of America Nat'l Trust & Savings Assoc. v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 1423, 143 L.Ed.2d 607 (1999) (noting that "one of the Code's innovations [was] to narrow the occasions for courts to make valuation judgments").

12. Although *Rivera* did not expressly state what it meant by "the Puerto Rico legal rate," one can fairly presume that the court was referring to a rate of interest fixed by Puerto Rico statute. The court supported its conclusion by citing two cases referring to "the legal rate of interest" fixed by an Illinois statute. *Rivera,* 116 B.R. at 19 (citing *In re Martin,* 17 B.R. 924, 926 & n. 4 (N.D.Ill.1982); and *In re Williams,* 3 B.R. 728, 732 (Bankr.N.D.Ill. 1980)).

the analysis for, regardless of whether it should have been, the court was clearly purporting to interpret § 726(a)(5).

*In re Schoeneberg,* 156 B.R. 963 (Bankr. W.D.Tex.1993), is another case utilizing the state law approach. *Schoeneberg* used the same method of analysis as the Fifth Circuit did to determine what rate of interest a secured creditor is entitled to under § 506(b). *See In re Laymon,* 958 F.2d 72 (5th Cir.1992). In *Laymon,* the Fifth Circuit observed the rule of statutory interpretation that the Code should not be construed to effect a major change in pre-Code practice absent some showing of Congressional intent to the contrary. *Id.* at 74 (citing *Dewsnup v. Timm,* 502 U.S. 410, 419, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992)). Because neither § 506(b) nor its legislative history refers to a specific rate of interest, *Laymon* concluded that it was appropriate to look to pre-Code practice to determine the rate of interest applicable under the section. *Id.* Using the Fifth Circuit's reasoning in *Laymon,* and despite the fact that the Bankruptcy Code, in contrast to the Bankruptcy Act, does seemingly provide a specific rate of post-petition interest to be paid on unsecured claims ("the legal rate" of interest), *Schoeneberg* turned to pre-Code law for its answer. *Id.* at 971–72. Since the overriding practice under pre-Code law was supposedly to award unsecured creditors post-petition interest at the contract rate, *Schoeneberg* did the same. *Id.* at 972.

Adding to the cadre of state law approach cases is *In re Carter,* 220 B.R. 411 (Bankr.D.N.M.1998). In that case, the court recognized the split of authority on the meaning of "interest at the legal rate." It then reached the somewhat dubious conclusion that "[t]he majority of cases follow the state law approach by providing that when a creditor seeks interest on his or her claim, the bankruptcy courts apply *the security agreement's interest rate.*" *Id.* at 415 (emphasis added). The majority of cases cited by *Carter* for its majority-view proposition were actually § 506(b) cases.

*Id.* at 415 n. 10. Of the eight cases cited by *Carter,* seven pertained solely to the post-petition interest rate payable to oversecured creditors under § 506(b). Only one, *Schoeneberg,* was a § 726(a)(5) case. The opinion also cited *Collier's* discussion of § 506(b). *See id.* (citing 4 *Collier on Bankruptcy* ¶ 506.04[2][b] (15th ed.1997)). Having started off on the wrong foot, *Carter* never does right itself. Like *Shaffer,* and overlooking § 726(a)(5)'s mandatory language, it wrongly stated that "the award of post-petition interest is a matter within the [c]ourt's discretion, dependent upon the equities in the case." *Id.* at 417. And based upon the equitable policy that a debtor should not receive a windfall at the expense of its creditors, the court held that—at least under the facts of that case—the unsecured creditors were entitled to receive post-petition interest at their contract rate if one existed.

Other state law approach cases are even less persuasive. *See In re Boehm,* 202 B.R. 99, 100 (Bankr.N.D.Ill.1996) (without analysis, the court awarded post-petition interest at a state statutory rate); *In re Huang,* 192 B.R. 184, 186 (Bankr.N.D.Ill. 1996) (same); *In re Beck,* 128 B.R. 572, 573 (Bankr.E.D.Okla.1991) (stating without elaboration that "the 'legal rate' [is] that rate of interest to which a creditor would have been entitled through any appropriate legal proceeding had the bankruptcy Petition never been filed"—that is, the contract rate, a specialized statutory rate, or the federal judgment rate, in that order); *In re Boyer,* 90 B.R. 200, 201 (Bankr.D.S.C.1988) ("[Section] 726(a)(5) provides for the payment of interest at the legal rate to creditors whose unsecured claims were paid. The legal rate is to be determined in accordance with South Carolina statutory law....").

The diversity of reasoning found in the above cases is revealing. In this Court's view, this is likely due to the fact that the state law approach does not readily lend itself to a satisfactory rationale. In any

event, we are unpersuaded by the state law approach cases.

## B. Federal Judgment Rate Approach Cases Are Only Somewhat More Satisfactory.

The seeds of the "federal judgment rate approach" were planted in *Laymon*, 117 B.R. 856. The issue in *Laymon* was the rate of post-petition interest to which oversecured creditors are entitled pursuant § 506(b). The court unquestioningly assumed that the principles that should guide a determination of the post-petition interest rate under § 726(a)(5), apply equally to § 506(b). *Id.* at 863. After a lengthy discussion of § 726(a)(5), the court announced that this section entitles unsecured creditors to post-petition interest at the federal judgment rate. *Id.* at 861. Applying the same reasoning to § 506(b), the court held that oversecured creditors are also entitled to receive post-petition interest at the federal judgment rate.

The court's holding with respect to § 506(b) was eventually overturned by the Fifth Circuit. *Laymon*, 958 F.2d 72. The Fifth Circuit held that § 506(b) entitles oversecured creditors to receive post-petition interest at the contract rate if one exists. *Id.* at 75. The Commercial Creditors assert that the Fifth Circuit's reversal of the bankruptcy court's reasoning with respect to § 506(b) should be viewed as a rejection of this reasoning for all purposes, including § 726(a)(5). They, therefore, contend that later cases adopting the reasoning of *Laymon* should be viewed as invalid. *See, e.g., Memorandum of Law of the U/S CC* at 26–29.

This contention is without merit. The correctness of the bankruptcy court's § 726(a)(5) discussion was not an issue on appeal. Consequently, its opinion on § 726(a)(5) was never repudiated. And it should be apparent that the contrasting language found in §§ 506(b) and 726(a)(5) are capable of different interpretations. Thus, it is reasonable to conclude that the Fifth Circuit believed that the interpreta-

tion of § 726(a)(5) was a matter better left for another day. *See generally, North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971) (Courts have neither the "power to issue advisory opinions ... [nor the] power to decide questions that cannot affect the rights of litigants in the case before them.") (internal citations omitted). Such a conclusion is bolstered by the fact that the Fifth Circuit's opinion in *Laymon* does not contain a single reference to § 726(a)(5).

The bankruptcy court in *Laymon* began its discussion of § 726(a)(5) by incorrectly stating that "post-petition interest is a matter within the discretion of the federal court[s]." *Laymon*, 117 B.R. at 860. This, of course, was the same erroneous premise upon which many of the state law approach cases relied. But unlike the state law approach cases, *Laymon's* reasoning does improve somewhat after this initial miscue. The court identified four principles that it believed should guide its interpretation of § 726(a)(5).

The first principle is that the award of post-petition interest in bankruptcy is governed by federal law. The next principle is that the purpose of post-petition interest is to compensate creditors "for the detention of money occasioned by the bankruptcy case itself." *Id.* And since this detention is the result of the bankruptcy case, the court believed that it was "not directly related to the prepetition agreements the debtor struck with its creditors," and was "visited equally on all creditors." *Id.* The third principle is that "[i]f there is a surplus, creditors should be compensated for the delay occasioned by bankruptcy before any balance is returned to the debtor." *Id.* at 861. The final principle recognized by the court is that "[t]he general purpose of ... bankruptcy ... is the equitable distribution of the debtor's assets among the debtor's creditors." *Id.*

Applying these principles to § 726(a)(5), the court first concluded that "interest at the legal rate" could not mean the contract

rate because that would be contrary to the equitable distribution of assets. *Id.* The fact that post-petition interest is controlled by federal law also militates against the use of "state-law contract rates." *Id.* The court also believed that the language of § 726(a)(5) suggested that a single rate should be applied equally to all unsecured claims. It further concluded that interest contemplated under the contract is expressly excluded from allowance by § 502(b)(2). *Id.* After rejecting the contract rate, the court concluded that "interest at the legal rate" could not mean a state judgment rate because post-petition interest is governed by federal law. *Id.* at 862.

The court finally settled on the federal judgment rate. In its view, this source yields an equitable distribution and comports with the notion that the award of such interest is controlled by federal law. It also reasoned that because from the petition date forward, a "creditor hold[s] the equivalent of a federal judgment against estate assets, enforceable only in federal court," only the federal judgment rate was appropriate. *Id.*

The first case to officially embrace the federal judgment rate approach in the form of a holding was *Godsey,* 134 B.R. 865. That case began its analysis with the actual language of the statute. *Godsey* said that since Congress had not defined "the legal rate" in § 726(a)(5), it was necessary to look to other sources to define the term. *Id.* at 866. But for whatever reason, the court made no attempt to identify a source that actually defined the term. Instead, it used the process of elimination.

*Godsey* compared the language of § 726(a)(5) with that of § 506(b). It stated that the latter section requires the bankruptcy court to look to the contract between the parties (if one exists) in order to determine the correct post-petition interest rate payable on oversecured claims. Since the language of the two sections is so different, the court concluded that "the

legal rate" could not be referring to the contract rate. *Id.*

The court then observed that the Bankruptcy Code expressly incorporates state law in a number of sections. *Id.* (citing §§ 544(b), 546(c) and 546(b)). This demonstrated to the court that Congress knew how to incorporate state law when it so desired. Because § 726(a)(5) does not contain an explicit reference to state law, the court decided that this section could not be referring to a state statutory rate. *Id.*

*Godsey* then turned to federal statutes. Although the United States Code contains a number of references to interest rates, the court held that the federal judgment rate as calculated pursuant to 28 U.S.C. § 1961(a) was the appropriate benchmark. Section 1961(a) is the source used to compute the post-judgment interest rate applicable to money judgments obtained in federal district court and the bankruptcy court is a unit of the district court. *Id.* While the court was careful to point out that it was not deciding whether the allowance of a claim is the equivalent of a judgment, it, nonetheless, believed that these factors pointed toward use of the federal judgment rate.

*In re Melenyzer,* 143 B.R. 829 (Bankr. W.D.Tex.1992), was issued shortly after *Godsey,* and was decided by the same bankruptcy judge who penned *Laymon.* This time, however, the interpretation of § 726(a)(5) was ripe for adjudication. Using the same reasoning that it employed in *Laymon,* the court held that the federal judgment rate was the appropriate rate of interest for § 726(a)(5). *Id.* at 833.

A number of cases since *Melenyzer* have also adopted the federal judgment rate approach. *See In re Beguelin,* 220 B.R. 94, 99–101 (9th Cir. BAP 1998); *In re Gaines,* 178 B.R. 101 (Bankr.W.D.Va.1995) (concluding without analysis that § 726(a)(5) requires payment of post-petition interest at "the federal legal rate"); *In re David Green Property Mgmt.,* 164

B.R. 92 (Bankr.W.D.Mo.1994); *Chiapetta,* 159 B.R. at 160–61 (rejecting position previously taken in *Shaffer* and adopting federal judgment rate approach).

While this Court agrees that post-petition interest paid pursuant to § 726(a)(5) must be determined in accordance with 28 U.S.C. § 1961(a), we do so largely independently of the above cases. *Laymon* and *Melenyzer,* for instance, make no attempt to construe § 726(a)(5). Instead, they rely exclusively on policy considerations. *Godsey* purported to interpret the words of § 726(a)(5), but, in this Court's view, does so unconvincingly. For these reasons, the Court declines to adopt wholecloth, the analysis of any of the federal judgment rate cases and, in the following section, we begin interpretation of § 726(a)(5) anew.

## C. "Interest at the Legal Rate" Commonly Understood to Mean a Rate Fixed by Statute

The Commercial Creditors insist that "interest at the legal rate" is commonly understood to mean "interest at the contract rate up to the maximum rate allowed to be contracted for, or, in the absence of a contractually specified rate, the otherwise applicable statutory rate." *Memorandum of Law of the U/S CC* at 8. Alternatively, they assert that the phrase is at best ambiguous and that due to its

paucity, legislative history on § 726(a)(5) is of little help in discerning Congressional intent. When a bankruptcy statute is vague, it "will not be deemed to have changed pre-Code law unless there is some indication that Congress thought that it was effecting such a change." *Ron Pair,* 489 U.S. at 252, 109 S.Ct. 1026 (O'Connor, Brennan, Marshall and Stevens, J.J., dissenting) (1989). *See also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 501, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) ("[I]f Congress intends for legislation to change the interpretation of a judicially created concept it makes that intent specific."). Relying on this rule of statutory construction, the Commercial Creditors assert that the Court should "conclude that Congress intended to continue pre-Code practice," which they contend was to pay unsecured creditors "post-petition interest at the rates specified in their contracts or, in situations where there was no contractually specified rate, at the otherwise applicable statutory rate." *Memorandum of Law of the U/S CC* at 10.

While it seems that cases decided under the Bankruptcy Act were not necessarily the model of clarity and uniformity the Commercial Creditors suggest,[13] we need not determine what the predominant methodology of calculating post-petition interest on unsecured claims was under the Act.[14]

---

**13.** *Compare In re Imperial '400' Nat'l Inc.,* 374 F.Supp. 949, 954 (D.N.J.1974) (Post-petition interest is paid at the contract rate if there is one, and otherwise at the "government legal rate."); *In re Chicago, Milw., St. P. and P.R.R.,* 791 F.2d 524, 530 (7th Cir.1986) ("[W]hen the debtor is solvent, the judicial task is to give each creditor the measure of his contractual claim, no more and no less."); *Commercial Paper Holders v. Hine (In re Beverly Hills Bancorp.),* 752 F.2d 1334, 1339 (9th Cir.1984) (awarding post-petition interest at the rate fixed by California's constitution), *with Johnson v. Norris,* 190 F. 459, 466 (5th Cir.1911) (unclear what source the court thought should be used to determine the post-petition rate of interest); *John Osborn's Sons,* 177 F. 184, 186–87 (2nd Cir.1910) (equating the allowance of a claim in bankruptcy with a judgment and concluding that the appropriate

post-petition interest rate was the federal judgment rate); *In re Norcor Mfg. Co.,* 36 F.Supp. 978, 980 (E.D.Wis.1941) (contract did not specify interest rate and it is not clear if the court would have awarded post-petition interest at the contract rate even if it had: "all that the creditor is entitled to is the face of his claim, plus accrued interest at the legal rate to the date of payment").

**14.** Bankruptcy Act cases did achieve uniformity on at least one issue now before the Court, the manner in which the term "the legal rate" was employed. Bankruptcy Act cases invariably used the term to mean a rate of interest fixed by statute. *See, e.g., Dayton v. Stanard,* 241 U.S. 588, 590, 36 S.Ct. 695, 60 L.Ed. 1190 (1916); *Dower v. Bomar,* 313 F.2d 596, 597 (5th Cir.1963); *Delatour v. Prudence Realization Corp.,* 167 F.2d 621, 622 (2d Cir.

For, as will be discussed below, "interest at the legal rate" is, and always has been, commonly understood to mean a rate of interest fixed by statute. Moreover, it is more likely than not that when Congress enacted § 726(a)(5), it intended for the phrase to carry this ordinary meaning.

■ The Bankruptcy Code does not define the phrase "interest at the legal rate." When a term or phrase is not defined in a statute, courts frequently turn to dictionaries in order to ascertain its common, ordinary meaning. *See, e.g., AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721, 737, 142 L.Ed.2d 835 (1999); *Lopez v. Monterey County*, 525 U.S. 266, 119 S.Ct. 693, 701, 142 L.Ed.2d 728 (1999); *Clark Equip. Co. v. United States*, 912 F.2d 113, 117 (6th Cir.1990).

As our task is to determine what Congress meant by "the legal rate" when it drafted § 726(a)(5) in 1978, those dictionaries available around the time of enactment are the most relevant. The edition of *Black's Law Dictionary* then in use defined "legal rate of interest" as "[a] rate fixed by statute where it is not fixed by contract, and it is unless otherwise specifically provided the maximum rate which may be contracted for." *Black's Law Dictionary* 1041 (4th ed. rev.1968); *see also Ballentine's Law Dictionary* 720 (3d ed.1969) (legal interest is defined as "[t]hat rate of interest prescribed by the law which will prevail in the absence of any contract between the parties fixing the rate").

Although reference to legal dictionaries in use during other periods is not decisive, it is nonetheless instructive. *Black's Law Dictionary* 700 (1891) (defining "legal interest" as "[t]hat rate of interest prescribed by the laws of the particular state or country as the highest which may be lawfully contracted for or exacted"); 45 *Am.Jur.2d*, Interest and Usury § 1 (1999)

("Legal interest is defined as the rate of interest prescribed by law which will prevail in the absence of a contract between the parties fixing the rate."); *Black's Law Dictionary* 894 (6th ed.1990) (defining "legal rate of interest" as "[a] rate of interest fixed by statute as either the maximum rate of interest permitted to be charged by law, or a rate of interest to be applied when the parties to a contract intend an interest rate to be paid [but] do not fix the rate in the contract."); *Black's Law Dictionary* 805 (5th ed.1979) (defining "legal interest" as "[t]hat rate of interest prescribed by law as the highest which may be lawfully contracted for or exacted").

The above definitions show that the meaning of "the legal rate of interest" has remained constant for a considerable period of time. At the same time, the various phraseologies used in these definitions tends to lack precision. And because of this, a non-frivolous argument could be made that some of these definitions support the view that "the legal rate of interest" means the contract rate if there is one. This is true, for instance, of the definition found in the 1968 edition of *Black's Law Dictionary,* which defines the term to mean "a rate fixed by statute where it is not fixed by contract." But this 1968 definition could also be understood to simply mean a rate of interest fixed by statute—more specifically, the statutory rate that will be employed when the parties have not otherwise agreed upon a rate. *See Ballentine's Law Dictionary* (3d ed.1969) (defining "legal rate" as: "that rate of interest prescribed by the law which will prevail in the absence of any contract between the parties fixing the rate"). And in the Court's view, when all of the definitions are considered together, the more credible interpretation of the term is a rate of interest fixed by statute, not contract.

---

1948); *Realty Assocs.*, 163 F.2d at 389; *Imperial '400'*, 374 F.Supp. at 954 (contrasting contract rate with "the government legal rate"); *In re Maryvale Community Hosp., Inc.,*

307 F.Supp. 304 (D.Ariz.1969); *Norcor Mfg.*, 36 F.Supp. 978; *Rollins v. Repper*, 69 F.Supp. 976, (E.D.Mich.1947); *In re Jones*, 2 B.R. 46, (Bankr.N.D.Ala.1979).

The best evidence, however, comes from case law. For over 100 years courts have consistently used the term to mean a rate of interest fixed by statute. *See, e.g., City of New York v. Saper,* 336 U.S. 328, 336, 69 S.Ct. 554, 93 L.Ed. 710 (1949) (referring to rate fixed by statute as "interest at the legal rate"); *Louisville & N.R. Co. v. Holloway,* 246 U.S. 525, 528, 38 S.Ct. 379, 62 L.Ed. 867 (1918) (referring to a rate fixed by Kentucky statute as that state's legal rate of interest); *Dayton v. Stanard,* 241 U.S. 588, 590, 36 S.Ct. 695, 60 L.Ed. 1190 (1916) (observing that "the ordinary legal rate" is the statutorily-fixed rate of interest that will apply when there is no contract); *American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.,* 233 U.S. 261, 264–65, 34 S.Ct. 502, 58 L.Ed. 949 (1914) (referring to "legal interest" as the applicable state statutory rate in situation where contract did not specify an interest rate); *Mohamed v. UNUM Life Ins. Co.,* 129 F.3d 478, 481 (8th Cir.1997); *In re M/V Nicole Trahan,* 10 F.3d 1190, 1192 (5th Cir.1994) (referring to the rate under 28 U.S.C. § 1961(a) as the "legal rate"); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.,* 888 F.2d 260, 269 (2nd Cir.1989) (same); *U.S. v. Griffin,* 782 F.2d 1393, 1395 (7th Cir.1986) (same); *Colegrove,* 771 F.2d at 123 (distinguishing between "interest [at] the legal rate," which is fixed by statute, and "the rate provided for in the original loan agreement"); *Memphis Sheraton Corp. v. Kirkley,* 640 F.2d 14, 19 (6th Cir.1981) (observing that "interest at the legal rate" is a rate fixed by statute); *Texas Eastern Transmission Corp. v. Marine Office–Appleton & Cox Corp.,* 579 F.2d 561, 568 (10th Cir.1978) (referring to the rate under 28 U.S.C. § 1961(a) as the "legal rate"); *National Packing Co. v. Century Provision Co.,* 354 F.2d 7, 9 (7th Cir.1965) (equating "legal rate" with a Kansas statutory rate); *Dower v. Bomar,* 313 F.2d 596, 597 (5th Cir. 1963) (noting Florida statute establishing the maximum "legal rate of interest" for loans to a corporation); *E.I. Du Pont De Nemours & Co. v. Lyles & Lang Constr.*

*Co.,* 227 F.2d 517 (4th Cir.1955) (referring to "interest at the legal rate ... [as a] rate fixed by statute"); *Delatour v. Prudence Realization Corp.,* 167 F.2d 621 (2d Cir. 1948) (calling the statutorily-created rate of interest imposed on debts overdue in New York as "the legal rate of interest"); *In re Realty Associates Securities Corp.,* 163 F.2d 387, 389 (2d Cir.1947) (equating "interest at the legal rate" with the statutory judgment rate); *Bins v. Artison,* 764 F.Supp. 129, 132 (E.D.Wis.1991) (referring to the rate under 28 U.S.C. § 1961(a) as the "legal rate"); *Reid v. Prudential Ins. Co. of America,* 755 F.Supp. 372, 377 (M.D.Fla.1990) (same); *Burston v. Commonwealth of Virginia,* 595 F.Supp. 644, 652 (E.D.Va.1984) (same); *In re Maryvale Community Hosp., Inc.,* 307 F.Supp. 304, 309 (D.Ariz.1969) (referring to rate of interest in an Arizona statute as "the Arizona legal rate of interest"); *In re Norcor Mfg. Co.,* 36 F.Supp. 978, 980 (E.D.Wis. 1941) (equating "the legal rate" with a Wisconsin statutory rate); *Rollins v. Repper,* 69 F.Supp. 976, 979 (E.D.Mich.1947) (referring to interest rate established by Michigan statute as "the legal rate of interest"); *Fitch v. Remer,* 9 F.Cas. 181, 184 (D.Mich.1860) (observing that in Michigan the legal rate of interest was a rate fixed by statute); *City of Danville v. Chesapeake & O. Ry.,* 34 F.Supp. 620, 637 (W.D.Va.1940) ("The legal rate of interest, generally speaking, is a rate fixed by statute ...."); *Davis,* 172 B.R. at 457 (referring to the rate under 28 U.S.C. § 1961(a) as the "legal rate"); *Goldblatt Bros.,* 61 B.R. at 465 (same); *In re Jones,* 2 B.R. 46, 49 (Bankr.N.D.Ala.1979) (awarding interest on judgment at "the legal rate" as established by Alabama statute).

Therefore, while the Court agrees with the Commercial Creditors that "interest at the legal rate" had a commonly understood meaning when Congress enacted the Bankruptcy Code in 1978, we also believe that they misconstrue what that meaning was. It is abundantly clear that "interest at the legal rate" was, and is, commonly

understood to mean a rate of interest fixed by statute, and not by contract.

The Court is also convinced that Congress intended for the term to carry this commonly understood meaning. For one thing, Congress enacted, for the first time, a statute requiring the payment of post-petition interest to unsecured creditors in solvent estates. And it specified "interest at the legal rate," when it could have simply said "interest." This is important because the language originally proposed for § 726(a)(5) was "interest on claims allowed." *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 93–137, 93d Cong., 1st Sess. (1973), § 4–405(a)(8), *reprinted in* Collier App.Pt. 4(c), at 4–679. An explanatory note to the Report illustrates what was meant by this phrase. It stated that "[t]he rate of interest is to be determined by other applicable law." *Id.* § 4–405, Note 6, *reprinted in* Collier App.Pt. 4(c), at 4–681.

█ The Commercial Creditors viewed this suggested language as an expression of the Bankruptcy Commission's desire to continue what they allege to be the pre-Code methodology for calculating post-petition interest on unsecured claims. *See Transcript of Hearing,* April 15, 1999 at 151–58 (statement of Ogden Lewis—counsel for the U/S CC). This may well have been the case. The problem for the Commercial Creditors, however, is that Congress rejected this language, choosing instead to use "interest at the legal rate."

The Commercial Creditors attempt to explain away this glitch in the legislative history by arguing that Congress merely adopted language that it believed more clearly articulated the true intent of the Bankruptcy Commission, as expressed in the explanatory note. Specifically, they assert "that [interest determined by] 'other applicable law' and 'interest at the legal rate' mean exactly the same thing." *Transcript of Hearing,* April 15, 1999 at 153 (Statement of Ogden Lewis). However, the Commercial Creditors are not correct on this point. In the bankruptcy context, "other applicable law" means all federal and state nonbankruptcy law. *See Patterson v. Shumate,* 504 U.S. 753, 759, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (the phrase "applicable nonbankruptcy law" in § 541(c)(2) of the Code encompasses all other applicable nonbankruptcy law, be it federal or state); *FDIC v. Canfield,* 967 F.2d 443, 446 (10th Cir.1992) (" '[O]ther applicable law' means all 'other applicable law.' "). "Other applicable law" is a broad, general term. Conversely, "interest at the legal rate" carries a much more definite meaning, a rate of interest fixed by statute. The two terms are not synonymous, as is evidenced by the fact that the Court found no case equating the two terms in any way whatsoever.

█ In the Court's view, Congress rejection of "interest on claims allowed," in favor of the more specific "interest at the legal rate" is significant.[15] First, "[a] re-

15. Certain of the Commercial Creditors asserted that, while Congress intended to continue pre-Code practice, it did not attempt to adopt language expressly describing pre-Code practice because this would have been too cumbersome. Transcript of Hearing, April 15, 1999 at 204–06 (statement of Alan Gelb—counsel for Bear, Stearns). But this assertion is without merit for two reasons. First, there is no evidence in the legislative history suggesting this to be the case.

Second, just how easy it would have been for Congress to implement language expressly continuing pre-Code practice is demonstrated by the following state statutes defining how "the legal rate of interest" awarded pursuant

to that particular statute is to be calculated. Cal.Civ.Code § 3289(b) ("If a contract ... does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach."); 16 Kan. Stat.Ann. § 16–201 (providing that the state's legal rate of interest is to be calculated at "the rate of ten percent per annum, when no other rate of interest is agreed upon."); 15 Okl.St. Ann. § 266 ("The legal rate of interest shall be six percent (6%) in the absence of any contract as to the rate of interest, and by contract the parties may agree to any rate as may be authorized by law, now in effect or hereinafter enacted."). Note that under some state statutes, such as the ones cited here,

jectèd proposition strongly militates against a judgment that Congress intended a result that it expressly declined to enact." *United States v. Flo–Lizer, Inc. (In re Flo–Lizer, Inc.)*, 916 F.2d 363, 365 (6th Cir.1990) (quoting *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974)); *cf. John Hancock Life Ins. Co. v. Harris Trust and Sav. Bank*, 510 U.S. 86, 100, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993) ("In resisting the argument that ... state law ... is preemptive, we are mindful that Congress had before it, but failed to pass, just such a scheme."). Second, a court "must assume that Congress carefully select[s] and intentionally adopt[s] the language" that it chooses to employ in a statute. *Ebben v. IRS*, 783 F.2d 906, 916 (9th Cir.1986). For this reason, one of the cornerstone rules of statutory interpretation is that " '[w]here Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.' " *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (quoting *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)); *Evans v. United States*, 504 U.S. 255, 259, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992); *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979); Hudson v. Reno, 130 F.3d 1193, 1199 (6th Cir.1997).

As already demonstrated, when the Bankruptcy Code was enacted in 1978, the phrase "interest at the legal rate" had long since acquired a well-established and commonly understood meaning—a rate of interest fixed by statute. And there is nothing in the legislative history to suggest that Congress intended for the term to have any other meaning. How strange it would be if Congress had selected a term with a well-settled meaning, and then, without saying so, intended for that term to carry an entirely new and different meaning.

There would seem to be only one way "interest at the legal rate" could mean what the Commercial Creditors say it does. And that is if Congress intended for the term to simply refer to "a" rate of interest that is legal. *See Ballentine's Law Dictionary* 713 (defining *"lawful interest"* as "[a]ny rate of interest up to that fixed by statute as the maximum rate at which interest can be charged by contract"). For a number of reasons, this could not have been the meaning intended by Congress.

The fact that "legal rate" is preceded by the definite article "the" in § 726(a)(5) indicates that Congress intended for a single source to be used for the calculation of post-petition interest, as opposed to using whatever rate of interest happened to be in the contract. *See Black's Law Dictionary* 1477 (6th ed. 1990) ("In construing statute, definite article 'the' particularizes the subject which it precedes and is word of limitation as opposed to indefinite or generalizing force 'a' or 'an.' ").[16] Moreover, to conclude that Congress intended the term to mean any legally permissible rate of interest, and thus the rate fixed by

---

"the legal rate of interest" that a creditor receives can be the same rate as the contract rate. However, this is only because the statute defining "the legal rate of interest" so provides. It is not because the contract rate is *per se* "the legal rate."

**16.** The Commercial Creditors caution the Court not to make too much of the fact that "legal rate" is preceded by "the." *Memorandum of Law of the U/S CC* at 20–21 (criticizing the Proponents' assertion that with § 726(a)(5) Congress intended to refer courts to a single source). The relevance and meaning of "the" in this context, however, is unassailable. As a previous edition of *Black's Law Dictionary* stated: "Grammatical niceties should not be resorted to without necessity; but it would be extending liberality to an unwarrantable length to confound the articles 'a' and 'the.' The most unlettered persons understand that 'a' is indefinite, but 'the' refers to a certain object." *Black's Law Dictionary* 1324 (5th ed.1979).

contract, one would have to accept the untenable notion that Congress felt the need to instruct bankruptcy courts not to allow post-petition interest at illegal or usurious rates. Not only is such a notion specious, but had Congress felt such instruction necessary, it presumably would have used "legal" in a similar manner throughout the Bankruptcy Code. But Congress did not do this. *See, e.g.,* 11 U.S.C. § 506(b) (allowing the holder of an oversecured claim to receive "interest on such claim").

The Court therefore concludes that Congress intended for "interest at the legal rate" to be imbued with its commonly understood meaning—a rate of interest fixed by statute.

### D. "The Legal Rate" Refers to the Rate Fixed by 28 U.S.C. § 1961(a)

The issue now is whether § 726(a)(5) refers to an interest rate fixed by a state statute, the federal judgment rate statute or some other federal statute. The Angelo Group, while conceding that "interest at the legal rate" means a rate fixed by statute, asserts that the appropriate statute to look to is the one fixing the post-judgment interest rate for the State of Michigan. *See* Mich.Comp.Laws § 600.6013. (Since this law mandates that judgments based on written instruments accrue interest at 12%—roughly double the rate applicable on the facts of this case pursuant to 28 U.S.C. § 1961(a)—it is not surprising that the Angelo Group champions the state rate.) The remaining Commercial Creditors similarly argue, at least implicitly, that if the post-petition interest rate is to be determined by reference to a statute, as opposed to contract, then the Court should look to the otherwise applicable state statute. For the following reasons, the Court concludes that Congress intended for post-petition interest to be determined in accordance with 28 U.S.C. § 1961(a).

A chapter 7 bankruptcy estate consists of all non-exempt assets that the debtor owns on the petition date. 11 U.S.C. § 541(a). For this reason, an estate's value will generally be fixed at the time of the filing. Similarly, each unsecured creditor's claim is valued as of the petition date. 11 U.S.C. § 502(b). Of course, creditors do not receive payment at this time. The length of time between the petition date and the date that creditors receive payment depends upon how quickly the bankruptcy estate can be administered. The delay in payment, therefore, results almost entirely from the procedural mechanisms of the bankruptcy laws. *See Bruning v. United States,* 376 U.S. 358, 362 n. 4, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964) ("[T]he delay incident to collecting and distributing the funds [of a bankruptcy estate] ... was the act of the law ....") (quoting *American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry.,* 233 U.S. 261, 266, 34 S.Ct. 502, 58 L.Ed. 949 (1914) (receivership case); *Vanston,* 329 U.S. at 163, 67 S.Ct. 237; *Debentureholders Protective Committee,* 679 F.2d at 269 (noting that once a petition is filed, it is the bankruptcy court, not the debtor, that is responsible for the detention of estate assets). Any post-petition interest that a chapter 7 estate is required to pay pursuant to § 726(a)(5) likewise accrues because of the delay caused by the administration of federal bankruptcy law. *Melenyzer,* 143 B.R. at 832 (post-petition interest is "compensation for the detention of money occasioned by the bankruptcy case itself"); *Godsey,* 134 B.R. at 867; *Laymon,* 117 B.R. at 860. The purpose of post-petition interest, then, is to compensate a successful creditor for any delay that occurs between the time of entitlement (the petition date) and the time of payment. It so happens that post-judgment interest, which is calculated pursuant to 28 U.S.C. § 1961(a), serves the same purpose. *See Bonjorno,* 494 U.S. at 835–36, 110 S.Ct. 1570 ("[T]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the

ascertainment of the damage and the payment by the defendant.)" (citation omitted)).

Given the purpose that it serves, courts recognize that post-judgment interest is procedural. *Bailey*, 838 F.2d at 152; *Harris v. Mickel*, 15 F.3d 428, 431 n. 4 (5th Cir.1994); *Transpower Constructors v. Grand River Dam Auth.*, 905 F.2d 1413, 1424 (10th Cir.1990); *Forest Sales Corp. v. Bedingfield*, 881 F.2d 111, 113 (4th Cir.1989); *Nissho–Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 624 (5th Cir.1988); *Weitz Co. v. Mo–Kan Carpet, Inc.*, 723 F.2d 1382, 1386 (8th Cir.1983). All procedural matters arising in federal court are decided by federal law. *Hanna v. Plumer*, 380 U.S. 460, 473, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). Accordingly, in federal court "[i]t is settled that ... [p]ost-judgment interest is determined by federal law. " *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir.1988) (quoting *James B. Lansing Sound, Inc. v. National Union Fire Ins. Co.*, 801 F.2d 1560, 1570 (9th Cir.1986)); *Travelers Ins. Co. v. Transport Ins. Co.*, 846 F.2d 1048, 1053–54 (7th Cir. 1988); *Bailey*, 838 F.2d at 152; *Nissho–Iwai*, 848 F.2d at 624; *Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d 1186, 1193–94 (10th Cir.1988); *Roy Stone Transfer Corp. v. Budd Co.*, 796 F.2d 720, 723 n. 6 (4th Cir.1986); *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1542 (11th Cir.1985); *Weitz*, 723 F.2d at 1386–87.

Since post-petition interest performs the same function as post-judgment interest, it too can be rationally classified as procedural. Moreover, "bankruptcy law is federal law." *Brown v. Felsen*, 442 U.S. 127, 136, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). From this it follows that the computation of post-petition interest in bankruptcy cases must be determined by reference to federal law, which of course means a federal statute. And this has long been the rule. *Vanston*, 329 U.S. at 163, 67 S.Ct. 237.

Other considerations bolster this conclusion. "Congress, when it desired to do so, knew how to restrict the scope of applicable law to 'state law' and did so with some frequency." *Patterson v. Shumate*, 504 U.S. 753, 758, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992) (citing a number of Bankruptcy Code provisions that explicitly incorporate "state law"— §§ 109(c)(2), 522(b)(1), 523(a)(5), 903(1), 362(b)(12), and 1145(b)). That it did not do so in this context speaks volumes, for Congress is presumed to have acted rationally. We, therefore, conclude that Congress intended for post-petition interest to be calculated pursuant to a federal statute.

Identifying which federal statute (or statutes) should be used to calculate post-petition interest under § 726(a)(5) is the simplest part of this problem. In Part II, the Court concluded that the allowance of a claim is equivalent to a "money judgment." And because of this fact, bankruptcy courts are required to calculate post-petition interest in accordance with 28 U.S.C. § 1961(a). But even if one does not agree that the two are equivalent, the fundamental similarities between an allowed claim and a money judgment are unmistakable. An allowed claim, like a judgment, gives the creditor a legal "right to payment" against the debtor. 11 U.S.C. § 101(5). Such entitlement is for a specified sum of money. *See* 11 U.S.C. § 502(b). If the parties are unable to agree on the amount of the claim, the bankruptcy court must resolve the dispute in accordance with the Federal Rules of Civil Procedure (incorporated into bankruptcy jurisprudence by F.R.Bankr.P. 9014). A bankruptcy court's order resolving such a dispute is a final and appealable order. *See* discussion *supra* Part II.B. The substantial parallels between an allowed claim and a money judgment make it highly probable that Congress intended for post-petition interest, like post-judgment interest, to be calculated at the federal judgment rate.

This probability increases when one considers three additional factors. The first is that an alternative federal statute that would be more appropriate than 28 U.S.C. § 1961(a) has not been suggested. Second, federal courts have long referred to the rate of interest calculated pursuant to § 1961(a) as "the legal rate" or "the federal legal rate." [17] And let us not forget that a respected treatise now states that for purposes of § 726(a)(5), it appears "that Congress envisioned ... [use of] the federal statutory rate for interest on judgments set by [28 U.S.C. § 1961(a)]." 6 *Collier on Bankruptcy* ¶ 726.02[5].

That Congress intended this result makes sense because "a chief purpose of the bankruptcy laws is to secure a prompt and effectual administration ... of the [bankruptcy] estate...." *Katchen*, 382 U.S. at 328–29, 86 S.Ct. 467 (citation omitted); *Chemetron Corp.*, 72 F.3d at 346; *Kowal v. Malkemus (In re Thompson )*, 965 F.2d 1136, 1145 (1st Cir.1992). Congress viewed this policy to be of particular importance in the context of a chapter 7 case. *See* 11 U.S.C. § 704 ("The trustee shall—(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of the parties in interest.").

Use of the federal judgment rate produces a number of salutary benefits that enhance the prospect of achieving the goal of efficient administration of a bankruptcy estate. By "afford[ing] all affected parties [an] ... easily ascertainable, nationally uniform rate," predictability within the bankruptcy process is increased. *Melenyzer*, 143 B.R. at 833. A uniform rate also keeps the bankruptcy estate from being saddled with potentially difficult and time-consuming administrative burdens. For instance, if the state law approach were used, the trustee would first have to determine whether a contract exists. If there is a contract, its interest rate may not be easy to identify. If there is a default rate, should that rate apply? Would application of the contract default rate hinge upon fuzzy notions of equity to which only the court is privy? If there is no contract rate, should the otherwise applicable rate be drawn from federal law or state law? If the post-petition interest rate is to be determined by reference to state law, the trustee must determine which state's law applies. Once the choice-of-law determination is made, the trustee would then have to identify which of the state's multiple statutory rates is most applicable.[18] On the other hand, if

**17.** *Mohamed v. UNUM Life Ins. Co.*, 129 F.3d 478, 481 (8th Cir.1997); *In re M/V Nicole Trahan*, 10 F.3d 1190, 1192 (5th Cir.1994); *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 269 (2nd Cir.1989); *U.S. v. Griffin*, 782 F.2d 1393, 1395 (7th Cir.1986); *Texas Eastern Transmission Corp. v. Marine Office–Appleton & Cox Corp.*, 579 F.2d 561, 568 (10th Cir.1978); *Bins v. Artison*, 764 F.Supp. 129, 132 (E.D.Wis.1991); *Reid v. Prudential Ins. Co. of America*, 755 F.Supp. 372, 377 (M.D.Fla. 1990); *Burston v. Commonwealth of Virginia*, 595 F.Supp. 644, 652 (E.D.Va.1984); *In re Davis*, 172 B.R. 437, 457 (Bankr.D.D.C.1994); *In re Goldblatt Bros., Inc.*, 61 B.R. 459, 465 (Bankr.N.D.Ill.1986).

**18.** Cursory research has identified 19 different statutory interest rates in Michigan alone. *See* Mich.Comp.Laws § 211.74 (redemption of land sold at tax sale requires payment of principal plus interest at 1.25% per month);

Mich.Comp.Laws § 290.672 (assessments on producers of marketable agricultural commodities accrue interest at 1% per month); Mich.Comp.Laws § 325.855 (loans made by the toxic substance loan commission accrue interest at 0% for the first 5 years, at 3% for the next 5 years, and at 2% less than the prime lending rate thereafter); Mich.Comp. Laws § 438.31 (Except for certain notes and bonds, the "legal interest rate ... of money shall be ... $5.00 upon $100.00 for a year, except that in all cases it shall be lawful for the parties to stipulate in writing for the payment of any rate of interest, not exceeding 7% per annum."); Mich.Comp.Laws § 438.31c(4) (interest rate on first mortgage may not exceed 25%); Mich.Comp.Laws § 438.31c(6) (unregulated lenders may charge maximum interest rate of 11% on mortgages and land contracts); Mich.Comp.Laws § 438.31c(7) (maximum interest rate on second mortgage is 11%); Mich.Comp.Laws § 438.31c(11) (nonresidential mortgage over $100,000 can

the trustee determines that federal law applies, she must determine whether to apply some specialized rate (like one found in the Internal Revenue Code) or the federal judgment rate. The trustee would then have to repeat this process for each unsecured claim, which could very well number in the hundreds. Setting the stage for such an administrative nightmare would not only be counter-intuitive, but would directly contradict fundamental bankruptcy policy.

In 1978, when the Code was adopted, bankruptcy trustees were (and still are) overwhelmingly individuals. Computers were not yet available. The kind of computations that these independent businesspeople would have been required to per-

form to properly implement a rule based on an interpretation of § 726(a)(5) other than one invoking 28 U.S.C. § 1961(a) would have been unduly burdensome, if not unworkable. Requiring the trustee to apply only one interest rate to the principal of every allowed unsecured claim immensely simplifies—and thereby expedites—the process of getting claims paid. And even before the amendment of § 1961(a) in October, 1982, when the statute merely incorporated the state judgment rate, the trustee still had only one rate to consider—the judgment rate in the state in which the bankruptcy court sat.

Some commercial creditors posited equitable arguments, relying to some extent on *Vanston*, which suggested that "bankrupt-

carry any rate of interest); Mich.Comp.Laws § 438.41 (unless otherwise permitted by law, the maximum rate of interest is 25%); Mich.Comp.Laws § 438.61 (loans to business entities made by a regulated lender can carry any rate of interest agreed to by the parties); Mich.Comp.Laws § 438.101 (interest on unpaid interest accrues at 7%, though parties can agree to pay up to 10%); Mich.Comp.Laws § 445.857 (retail installment contract can carry the rate of interest a regulated lender is permitted to charge pursuant to the "credit reform act" found at Mich.Comp.Laws § 1851 *et seq.*); Mich.Comp.Laws § 445.1204b (based on formula in statute, interest rate on "home improvement charge agreement" will be between 1.2% and 1.375% per month); Mich.Comp.Laws § 445.1301 (provides extremely confusing formula that, when applied, will supposedly set the interest rates on home improvement installment contracts at somewhere between 8% and 16.5%); Mich.Comp.Laws § 445.1854(1) (pursuant to credit reform act, a "regulated lender may charge, collect, and receive any rate of interest or finance charge for an extension of credit not to exceed 25% per annum"); Mich.Comp.Laws § 445.1854(2) (pursuant to credit reform act, "[a] depository institution may charge, collect, and receive any rate of interest or finance charge for a credit card arrangement"); Mich.Comp.Laws § 450.1275 (corporation may agree to pay any rate of interest); Mich.Comp.Laws § 491.718 (savings and loans may charge: interest of no more than 1.5% per month on credit card arrangements; a maximum rate of interest of 15% on all non-first mortgage home loans and non-residential real property loans under $100,000; and a maximum rate of interest of 14.55% per year on all other loans except for

those specified in § 491.702); Mich.Comp.Laws § 492.118 (An installment sale contract on a motor vehicle can carry the maximum interest rate permitted by the credit reform act); Mich.Comp.Laws § 493.13 (A licensed lender may loan money at a rate of interest that does not exceed that rate permitted by the credit reform act); Mich.Comp.Laws § 493.110 ("On loan made ... pursuant to a credit card arrangement, a [licensed lender] may collect interest not to exceed 1.5% per month"); Mich.Comp.Laws § 600.6013 (judgments on written instruments shall carry a minimum interest rate of 12% and a maximum of 13%; all other judgments shall have an interest rate of 1% over the 5-year U.S. Treasury rate).

This sampling of Michigan statutes shows that determining the state statute that would be most applicable to a given claim would be no easy task. The next step, actually determining the correct interest rate, could also be a complicated proposition. *See e.g.*, Mich.Comp.Laws §§ 325.855; 445.1204b and 445.1301 (discussed above). Moreover, since claims come in all flavors, there will be some claims for which no state statute seems applicable. For instance, which state statute would the trustee apply to personal injury claims? At least some of the Commercial Creditors, the Angelo Group, would seem to suggest the state judgment rate. *See Memorandum of Law of the Angelo Group* at 7 (citing Mich.Comp.Laws § 600.6013). This would be appropriate, however, only if the allowance of a personal injury claim were substantially equivalent to a judgment. But if this is so, it is a judgment entered in federal court.

cy courts must administer and enforce the Bankruptcy Act as interpretated by this Court in accordance with authority granted by Congress to determine how and what claims shall be allowed *under equitable principles.*" 329 U.S. at 163, 67 S.Ct. 237 (emphasis added). *Id.* (Courts do not generally allow post-petition interest on unsecured claims because "it would be *inequitable* for anyone to gain an advantage or suffer a loss because of [a] delay" caused by the court's processes.) (emphasis added). *Vanston* referred to principles derived from equity receiverships because the Bankruptcy Act was silent on the question of interest. But the Bankruptcy Code is not. Post-petition interest on unsecured claims in solvent estates is *mandated;* reliance on equitable notions is unnecessary.

▮▮▮▮ Furthermore, although it is frequently described as a "court of equity," a bankruptcy court is not empowered to ignore the actual provisions of the Bankruptcy Code in order to reach a result that it finds more palatable. *See United States v. Noland,* 517 U.S. 535, 538–39, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996) (cautioning that while a bankruptcy court is a court of equity, it can only do that equity which is permitted by the Bankruptcy Code); *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Therefore, this Court is dutybound, equitable concerns notwithstanding, to apply "interest at the legal rate" in accordance with its most plausible meaning—the rate of interest fixed by 28 U.S.C. § 1961(a). Even were the Court to decide the case by balancing equitable concerns, however, the holding would be unchanged.

The Commercial Creditors argue that if they are paid post-petition interest pursuant to § 1961(a) that they will not receive the benefit of their bargain. And if they do not receive the benefit of their bargain

the Debtor's shareholders will, by the mere happenstance of bankruptcy, unfairly receive a windfall at the creditors' expense. *See Memorandum of Law of the U/S CC* at 14 n. 6; *Memorandum of Law of Halcyon* at 4; *Supplemental Brief of Chase Manhattan Bank* at 15; *Memorandum of Law of the Angelo Group* at 6.

But as explained, post-petition interest does not serve to continue the contractual rights which formed the basis of the underlying claim. Rather, just as with post-judgment interest, it serves to compensate the successful party for any delay that occurs between the time of entitlement and the time of payment. Congress obviously viewed the federal judgment rate as both fair and adequate for purposes of post-judgment interest. It is reasonable to conclude that Congress believed the rate of interest provided by 28 U.S.C. § 1961(a) was sufficient to accomplish the identical task performed by post-petition interest. Thus, the payment of post-petition interest at the federal judgment rate does not provide a windfall to debtors and its use cannot be seen as being inequitable to unsecured creditors.

Furthermore, had we been hearing this argument in 1982 instead of 1999, the Commercial Creditors would likely have been taking the other position. In 1982, in the midst of a serious inflationary environment, market interest rates were approaching 20%. The complaints of creditors, who were constrained by far lower contract rates, were heard by Congress. Congress amended 28 U.S.C. § 1961(a) to let the judgment interest rate float with the market. For those creditors holding claims arising from older contracts or contracts limited by old usury laws, the possibility of escape from such rates by use of the more liberal federal judgment rate would have been enticing.[19] Would a debtor then argue that use of the federal judg-

---

19. Indeed, bondholders advanced just such an argument in *Realty Assocs.,* 163 F.2d at 390. The contract rate there was 5%, but the legal rate, which the court said was New York's judgment rate, was 6%. Relying on

*John Osborn's Sons,* 177 F. 184, the bondholders asserted "that allowance by the court of the claim on the bonds is a judgment which bears interest at the legal rate from the date of the Chapter X petition." *Id.*

ment rate was inequitable—and demand use of the contract rate? In short, a myopic view of equity, limited to the current facts, is neither appropriate nor consistent with the role of a court when a statute governs.

Certain of the Commercial Creditors also argue that, while it may be appropriate to equate "interest at the legal rate" with the federal judgment rate in some cases, it is not appropriate to do so here because, in essence, this case is different. *See Supplemental Brief of Chase Manhattan Bank* at 10 (federal judgment rate "cases are wholly inapplicable as they address factual scenarios distinguishable from the facts herein"); *Memorandum of Law of Halcyon* at 16–17 (arguing that "special facts and circumstances," different from those here, existed in cases applying the federal judgment rate); *Memorandum of Law of Bear, Stearns Investment Products* at 17 (Federal judgment rate cases "all reflect exercise by the [b]ankruptcy [c]ourt of its substantial discretion under the Code to protect the interest of all creditors."). This argument illustrates with particular clarity why courts have only those equitable powers expressly set forth in the Code: If bankruptcy laws are to mean anything, the Code's provisions cannot be ascribed chameleon-like qualities, constantly changing in meaning depending on the facts of the case or the whims of the court. Thus, "interest at the legal rate" must be given the same meaning regardless of whether the case at hand is a small chapter 7 or a large chapter 11.

Chase Manhattan Bank also suggests that equating "interest at the legal rate" with the federal judgment rate will potentially have a devastating impact on the capital markets system. "A primary component of [this] system is the primacy of debt over equity in the scheme of recoveries." *Supplemental Brief of Chase Manhattan Bank* at 13. That is, lenders have the right to be paid in full before equity is entitled to receive a return on its investment. Chase contends that using the fed-

eral judgment rate will cause this fundamental component of the capital markets system to be turned on its head, and lenders will view the Bankruptcy Code as embodying "a principle of prejudicing creditors for the benefit of equityholders." *Id.* at 14. The result, according to Chase, will be that financially troubled businesses will be able to secure financing only at exorbitant rates if they are able to do so at all. *Id.; see also* Transcript of Disclosure Hearing, January 21, 1999 at 223–25 (Statement of Mark Bane—counsel for Chase Manhattan Bank). Again, Chase would not be making this argument in 1983; it would have been begging for the federal judgment rate.

Chase's sky-is-falling argument is unpersuasive for another reason. If applying the federal judgment rate would have the catastrophic effects that Chase postulates, those effects would have already been felt in those jurisdictions where bankruptcy courts have utilized the federal judgment rate approach. Chase suggested no evidence that banks in these jurisdictions have stopped making loans to troubled businesses. Moreover, one can only presume that the percentage of loans made to businesses on the brink of bankruptcy is extremely small. And the percentage of unsecured loans made to such businesses is undoubtedly smaller yet. Thus, the horrible impact that Chase warns would befall the capital markets system if this Court interprets "interest at the legal rate" to be the federal judgment rate is simply smoke and mirrors.

■ The Angelo Group further argues that in order to avoid an absurd result that could not have been intended by Congress, the best-interest-of-creditors test must be interpreted to "require[ ] payment of interest at the same rate that would apply absent bankruptcy." *Memorandum of Law of the Angelo Group* at 9. As noted, the best-interest-of-creditors test requires that a creditor "receive or retain under the plan ... property of a value ... that is not less than the amount that such holder

would ... receive or retain" in a chapter 7 liquidation. 11 U.S.C. § 1129(a)(7). In chapter 7, a corporate debtor does not receive a discharge. 11 U.S.C. § 727(a)(1) ("The court shall grant the debtor a discharge, unless—(1) the debtor is not an individual"). Citing cases which state that a debtor remains liable for post-petition interest on non-dischargeable claims, such as *In re Hanna*, 872 F.2d 829 (8th Cir. 1989), *In re Fullmer*, 962 F.2d 1463 (10th Cir.1992), and *In re Roa–Moreno*, 208 B.R. 488 (Bankr.C.D.Cal.1997), the Angelo Group concludes that if the interest rate payable pursuant to § 726(a)(5) is construed to mean a rate that is less than the rate that would be "provided by state law ..., then the Debtor's creditors would ... retain the right to sue the Debtor for the difference." *Id.* at 10.

The cases cited by the Angelo Group do not support its argument for they merely stand for the proposition that post-petition interest continues to accrue on claims that are not discharged. None of the cases cited address what the appropriate rate of post-petition interest is. In addition, neither § 726(a)'s rules of distribution nor the cases cited by the Angelo Group lead to the conclusion that the best-interest-of-creditors test requires payment of post-petition interest at the same rate that would apply outside of bankruptcy.

■ When employing the best-interest-of-creditors test, courts look at the dividend the creditor would receive from the chapter 7 trustee—and only that amount—for comparison with the dividend available under the plan. 7 *Collier on Bankruptcy* ¶ 1129.03[7][b]. A best-interests-of-creditors test that is almost identical to the one found in § 1129(a)(7) is contained in § 1325(a)(4). Courts construing this chapter 13 provision uniformly hold that amounts obtainable from other sources,

such as guarantors, are irrelevant when performing that section's best-interest-of-creditors test. *In re Rimgale*, 669 F.2d 426, 430 (7th Cir.1982) (Liquidation analysis "does not include additional amounts that a creditor may be able to collect after a liquidation."); *In re Syrus*, 12 B.R. 605, 608 (Bankr.D.Kan.1981); *In re Hurd*, 4 B.R. 551, 553 (Bankr.W.D.Mich.1980); 8 *Collier on Bankruptcy* ¶ 1325.05[2][a] (Only estate property held on the date the petition is filed is part of the liquidation analysis.). *Cf.* 5 *Norton Bankruptcy Law and Practice 2d* § 122:7 ("[T]he test involves no comparison of plan payments and the amount a creditor might receive upon collection of a nondischargeable debt after exception from the discharge in a Chapter 7 case."). By analogy then, it would be irrelevant whether a creditor who receives full payment of principal plus post-petition interest at the federal judgment rate could, after the close of the bankruptcy, file a new lawsuit to recover additional interest.

■ On the other hand, a corporate debtor whose assets are liquidated in chapter 7 does indeed remain liable for claims not paid in full since such claims are not discharged. 11 U.S.C. § 727(a)(1). And § 1129(a)(7)'s version of the best-interest-of-creditors test is actually slightly different from § 1325(a)(4)'s. The chapter 11 version refers to the "amount that ... [a creditor] would ... receive or retain" in a chapter 7, whereas § 1325(a)(4) refers to the "amount that [a creditor] would be paid" in chapter 7. Thus, a non-frivolous, but decidedly novel, argument could be made that § 1129(a)(7)'s best-interests-of-creditors test should account for the value of any cause of action that a creditor would *retain* against a chapter 7 corporate debtor.[20]

---

20. No case has ever discussed, let alone decided, this issue. And *Collier* 's discussion of § 1129(a)(7)'s bestinterest-of-creditors test applies the chapter 13 formulation, entirely disregarding the "or retain" terminology. *Collier on Bankruptcy* ¶ 1129.03[7][b] ("[A] creditor or interest holder must receive (i) property (ii) that has a present value equal to (iii) that participant's hypothetical chapter 7 distribution (iv) if the debtor were liquidated instead of reorganized on the plan's effective date."). *Norton* is also silent on this issue.

One response is that the term "retain" merely reflects the fact that § 1129(a)(7) is intended to protect secured creditors and equity interests holders as well as unsecured creditors, while § 1325(a)(4) protects only unsecured creditors. But more significantly, both provisions refer to "the amount" that a claimant would receive, retain or be paid in a chapter 7. Obviously, the term "amount" refers, not to an unliquidated claim of an uncertain value, but to a specified sum.

■ This last point reveals an even more fundamental weakness underlying the Angelo Group's argument. The argument is based on the assumption that an otherwise non-dischargeable, unsecured claim could pass through bankruptcy without being liquidated or estimated and that, as a result, the holder of the claim would be excluded from sharing in the *pro rata* distribution of a debtor's assets. Section 726(a) demonstrates that this assumption is incorrect. And in fact, when estate proceeds are sufficient, the Bankruptcy Code requires all claims to be paid in full with interest, thereby leaving nothing upon which to sue. In other words, the most that an unsecured creditor is entitled to receive in a chapter 7 proceeding is the value of its claim as of the petition date plus post-petition "interest at the legal rate." Once an unsecured claim is paid in accordance with the above formula, it is satisfied and the claimant will have no further recourse against the debtor. Were this not the case, Congress would not have expressly provided for estate proceeds remaining after such distribution to be returned to the debtor. *See* 11 U.S.C. § 726(a)(6). If a chapter 11 plan of reorganization proposes such a distribution scheme, as the Joint Plan does, this aspect of the plan *a fortiori* satisfies § 1129(a)(7)'s best-interest-of-creditors test. In addition, there is no basis to conclude from the above discussion that a statutory absurdity or inconsistency would result from equating "interest at the legal rate" with the federal judgment rate.

■ It can be seen, then, that the Angelo Group is actually asserting that an unsecured creditor dissatisfied with the post-petition interest rate that it receives in bankruptcy may collaterally attack the bankruptcy court's judgment in state court. But, of course, a creditor cannot do this. *See, e.g., MSR Exploration Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910, 915 (9th Cir.1996) ("Congress' grant to the federal courts of exclusive jurisdiction over bankruptcy petitions precludes collateral attacks on such petitions in state courts ...."); *see also* 28 U.S.C. § 1334(a) ("[T]he district courts shall have original and exclusive jurisdiction of all cases under title 11.").

For the above reasons, the Court concludes that, within the context of § 726(a)(5), "interest at the legal rate" means the federal judgment rate.

### IV. Recapitulation

In this opinion, the Court was required to construe § 726(a)(5), and specifically, the meaning of "interest at the legal rate." At the outset it was determined that there were two ways to approach this problem. In Part II, the Court held that because an allowed claim is a money judgment, 28 U.S.C. § 1961(a) must be used to determine the rate of post-petition interest paid pursuant to § 726(a)(5). In Part III, it was determined that even if one does not agree that an allowed claim is equivalent to a money judgment, the same outcome is achieved since "interest at the legal rate" was commonly understood in 1978 to mean a rate of interest fixed by statute. Finally, the Court held that the statute to which Congress was referring when it said "interest at the legal rate" in 11 U.S.C. § 726(a)(5) was 28 U.S.C. § 1961(a). Accordingly, the Commercial Creditors' objection to confirmation is overruled.